Slip Op. 04 - 115

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| SENSIENT TECHNOLOGIES CORP., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **Before: MUSGRAVE, JUDGE** |
| | : | |
| UNITED STATES, | : | Court No. 03-00283 |
| | : | |
| Defendant | : | |
| | : | |
| and | : | |
| | : | **PUBLIC VERSION** |
| ROHA DYECHEM LTD., and | : | |
| NEELIKON FOOD DYES & | : | |
| CHEMICALS, LTD. | : | |
| | : | |
| | : | |
| Defendant-Intervenors. | : | |

[Plaintiff brought this action challenging the negative preliminary injury determination of the International Trade Commission ("ITC") in its antidumping and countervailing duty investigations of *Allura Red Coloring from India*, 68 Fed. Reg. 20,170 (Apr. 24, 2003). Plaintiff argued that there was not a rational nexus, supported by record evidence, between the facts found and the decision to issue a negative determination. Plaintiff also contended that the ITC violated its due process rights by failing to release critical documents which it relied upon. The ITC argued that its negative determination was supported by clear and convincing evidence and that all parties were afforded an opportunity to participate fully in the proceedings. **Held:** Plaintiff's motion is denied and the determination of the ITC is sustained.]

Decided: September 10, 2004

*Baker & McKenzie* (*Kevin M. O'Brian*, *Thomas Peele*, and *Lisa A. Murray*) for Plaintiff.

*James M. Lyons*, Acting General Counsel, United States International Trade Commission (*Laurent M. de Winter*) for Defendant.

*Garvey Schubert Barer* (*Lizbeth Levinson* and *Ronald M. Wilsa*) for Defendant-Intervenors.

## OPINION

Sensient Technologies Corp., a U.S. producer of allura red coloring,[1] brings this action challenging the negative preliminary determination by the International Trade Commission ("ITC" or "the Commission") in its antidumping and countervailing duty investigations of *Allura Red Coloring from India*, 68 Fed. Reg. 20,170 (Apr. 24, 2003).  Sensient contends that the ITC's determination was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law because there is not a rational nexus, supported by record evidence, between the facts found and the decision to issue a negative determination.  Furthermore, Sensient contends that the ITC violated its due process rights by failing to release critical documents on which the Commission relied.  For these reasons, Sensient moves for judgment on the agency record asking the Court to vacate the ITC's determination and remand with instructions that the ITC either enter an affirmative preliminary determination or permit the parties to submit comments on record documents that were not released and reconsider its determination in light of those comments.  The ITC argues that its negative determination is supported by clear and convincing evidence and that all parties, including

---

[1] Allura red is a synthetic food coloring used in food, drugs, and cosmetics.  Each batch must be certified by the Food and Drug Administration before it can be used in food, and once certified it is also referred to as FD&C Red No. 40.  Ninety percent of allura red is used to color food products and there are no similar or substitute products for allura red.

Sensient, were afforded an opportunity to participate fully in the proceedings. For the reasons that follow, Sensient's motion is denied and the determination of the ITC is sustained.

### *Background*

In March 2003 Sensient filed a petition with the ITC and the Department of Commerce alleging material injury or threat of material injury to the U.S. allura red industry due to subsidized and less-than-fair-value imports of allura red from India. Imports from India comprised 100 percent of all imports of allura red during the period of investigation. The ITC initiated antidumping and countervailing duty investigations, but made a negative preliminary determination. *See Views of the Commission* (Apr. 29, 2003) Confidential Record List 2, Doc 24 ("ITC Views") at 2.

In making a preliminary determination the ITC examines whether "there is a reasonable indication that an industry in the United States . . . is materially injured, . . . or is threatened with material injury" by imports of the subject merchandise. 19 U.S.C. § 1673b(a)(1)(A)(i)-(ii). Regarding material injury, the ITC found that:

> The absolute volume and value of U.S. imports of allura red from India fluctuated {significantly} during the period of investigation . . . . The U.S. market share held by shipments of subject imports increased on the basis of apparent domestic consumption [                                                    ]. On the basis of value, subject imports' market share followed similar trends . . . . The domestic industry held more than [ ] percent of the U.S. market for allura red coloring during the entire period of investigation. As a share of domestic production, subject imports were [
> ].

ITC Views at 13 (citations omitted). Although "subject imports consistently undersold the domestic

like product during the period of investigation" the margins became smaller and "{s}ubject import prices reached their highest point at the end of the period of investigation when subject import volume was at its highest." *Id*. at 14 (footnote omitted). Prices of domestically produced allura red "fluctuated without clear patterns," but "trended downward somewhat over the period of investigation." *Id.* at 15. The ITC concluded that "{a}ny decline in prices for the domestic like product cannot be attributed, to a significant degree, to the subject imports" because the volume was very small and "domestic prices began declining during 2000, a year in which subject imports were only {a minimal percentage} of consumption." *Id*. at 15-16. Furthermore, "prices for subject imports generally rose over the period of investigation such that underselling margins were generally reduced." *Id*. at 16. Thus there was "a lack of correlation between trends in the volume and prices of the subject imports and the volume and prices of the domestic like product." *Id*. (footnote omitted).

The ITC also found that demand for allura red increased during the period of investigation. *Id*. at 8. The domestic industry's production levels, shipments, and capacity utilization all increased from 2000 to 2002, and although "apparent domestic consumption volume decreased slightly . . . the industry's dominance over the market remained virtually unchallenged." *Id*. at 19. Furthermore, "{t}he domestic industry's financial performance was robust" and "{g}ross profits, operating income, operating income ratios and net income all increased from 2000 to 2002." *Id*. (footnote omitted). Therefore, the ITC concluded that "{t}he record indicates that the small increase in subject import volumes and lower import prices has little, if any, adverse impact on the financial condition or production operations of the domestic industry." *Id*.

The ITC also found no reasonable indication of threat of material injury to the domestic industry from the Indian imports. This finding was based in part on the ITC's observations that the domestic industry was "robust," that it maintained a dominant market share, and that the rate of increase in volume and market share of the subject imports was small. *Id*. at 22. The ITC also found no indication that "unused production capacity or any imminent increases in production capacity in India will lead to substantially increased imports in the imminent future" because the "unused capacity existed from the beginning of the period of investigation and did not result in significant export volumes to the United States." *Id*. Furthermore, exports to markets other than the United States were growing and becoming increasingly important and "{i}nventories held by U.S. importers and Indian producers remained modest in the context of the overall U.S. market." *Id*. at 23 (footnote omitted).

The ITC found that the potential for product shifting was limited due to the fact that dyes are sold as a package which includes a range of colors. Thus it would be impractical to shift equipment used to produce allura red to produce a different color dye since a customer would want both colors. Additionally, the ITC disagreed with Sensient's contention that an Indian producer, was poised to take the supply contract of a large customer away from Sensient. The ITC found that this was "not imminent, nor necessarily likely" because Sensient's contract appeared to go to the end of 2003. *Id*. at 24. Furthermore, the ITC concluded that the customer in question could secure prices lower than what Sensient offered based on the volume of merchandise it purchased. The ITC also found it unlikely that subject imports would have an adverse effect on domestic prices since the margin of underselling decreased during the period of investigation. Likewise, it found no likelihood that the

imports would negatively effect the domestic industry's development and production efforts and noted that capital expenditures had increased during the period of investigation even as the volume and market share of subject imports rose.  Finally, the ITC found that although several of the alleged subsidies might be export subsidies in violation of a World Trade Organization agreement, these would not likely increase the volume of subject imports because they had existed for years and had not affected the volume of imports during the period of investigation.   For the foregoing reasons, and because the trends in the domestic industry's performance were positive, the ITC found no reasonable indication that the domestic industry was threatened with material injury.

*Arguments*

Sensient argues that there is ample evidence indicating that the domestic industry was materially injured by the subject imports.   First, Sensient contends that lost sale and lost revenue allegations were either confirmed, denied ambiguously, or uncontested.   One customer disagreed with a lost sale only with regard to the quantity, not the fact that it was a lost sale.  In another instance, one of Sensient's customers awarded a contract to an Indian producer via an Internet auction, but disagreed that Sensient lost this sale since it had no record of Sensient participating in the auction.  Sensient contends that it did participate, but that it is sometimes difficult to tell who the participants are in an Internet auction.  Sensient believes that these issues would be resolved if the ITC moved forward and made a final determination.

Sensient also argues that import volumes increased from "nonexistent to significant and injurious levels."  Brief in Support of Plaintiff Sensient Technologies Corporation's Motion for Judgment on the Agency Record ("Pl.'s Br.") at 6.  Sensient cites an ITC staff report noting that a national import specialist with the U.S. Customs Service believed that entries of allura red from India were being incorrectly classified and that the total value entered under the proper tariff subheading represented only a small percentage of the value India records in its export statistics.  Moreover, assuming the data supplied by the Indian producers is accurate, Sensient argues that this data shows that market penetration increased steadily.  For these reasons, the ITC should have continued its investigation to a final determination and confirmed whether the Indian producers captured, or were likely to capture, additional sales from U.S. producers.

Finally, with respect to actual material injury, Sensient argues that other evidence on the record indicates that the domestic industry was harmed by imports of allura red.  Sensient notes that the domestic and imported merchandise are "interchangeable and highly substitutable." Pl.'s Br. at 9-10.  Sensient also notes that "the apparent dumping margins that led Commerce to initiate an investigation were immense, ranging from *137.69 to 226.21%.*"  *Id*. at 10 citing 68 Fed. Reg. 15,433 (emphasis in Pl.'s Br.).  Sensient calls attention to the fact that deteriorating market conditions made it unable to use production equipment it purchased from another domestic producer in early 2000, and thus it has operated at [          ] percent of capacity.  [

                                                                              ]. Furthermore, allura red inventories grew considerably from 2000 to 2003 and the number of production-related employees declined slightly.

Regarding threat of material injury, Sensient argues that the Indian allura red producers benefit from export subsidies, which it asserts is *prima facie* evidence of a threat to the U.S. market. Sensient also argues that the import volumes have been steadily increasing and the conference testimony of one Indian producer indicates that it "plans to squeeze out any industry player, other than possibly Sensient, from the U.S. market." Pl.'s Br. at 14.  Finally, Sensient notes that market prices were declining, Indian producers had the capacity to increase shipments to the U.S., which is the only market for allura red, and even without increasing production they had significant inventories on hand.   Sensient asserts that the ITC's conclusion that there is no threat of material injury does not follow from this record evidence.

Finally, Sensient argues that it was denied due process of law because the ITC did not provide it with copies of certain importer questionnaire responses, the ITC staff report, memoranda of *ex parte* communications, and internal worksheets until after the ITC had issued its preliminary determination.  Sensient notes that "the meaningful opportunity to participate in the adjudicative process before the agencies charged with administering the antidumping and {countervailing duty} laws is a fundamental aspect of due process."  Pl.'s Br. at 23 citing *Chung Ling Co., Ltd. v. United States*, 23 CIT 829, 837, 829 F. Supp. 1353, 1361 (1993).  Sensient also asserts that the relevant statute, 19 U.S.C. §§ 1677f(c)(1)(A) and (C), provides that the ITC was required to release all business proprietary information to the parties within seven days of its submission.  Reply Brief in Support of Plaintiff Sensient Technologies Corporation's Motion for Judgment on the Agency Record ("Pl.'s Reply Br.") at 15-16.

Because the ITC stated that it relied on the importer questionnaires, *see* ITC Views at 13 and n.60, Sensient contends this was not a harmless error.  Specifically, it claims that it could have clarified lost sale and lost revenue allegations if it had received the responses in a timely manner and had an opportunity to comment.  Moreover, Sensient argues that the ITC "is presumed to have considered all of the evidence on the record in making its determination . . . {t}hus, all of the record evidence was relevant to the Commission's decision, and parties covered by the administrative protective order were entitled to view all of it."  Pl.'s Reply Br. at 14.   Sensient concludes that due process considerations require that the ITC's determination be vacated and that the ITC vote again on the matter once it has comments from all interested parties.

The ITC counters the arguments raised by Sensient asserting that its determination is supported by clear and convincing evidence and that all parties were afforded an opportunity to participate fully in the proceedings.   The ITC contends that Sensient's arguments are premised on a flawed understanding of the "reasonable indication" standard found in 19 U.S.C. § 1673b(a)(1). The Commission argues that the Federal Circuit and this Court have "rejected the notion that the 'reasonable inquiry' standard is met if the record evidence in a preliminary investigation merely raises the 'possibility' of injury."  Memorandum of Defendant United States International Trade Commission in Opposition to Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record ("Def.'s Br.") at 7 citing *American Lamb v. United States*, 785 F.2d 994, 1001-02 (Fed. Cir. 1986) and *Texas Crushed Stone Co. v. United States*, 23 CIT 428, 438, 822 F. Supp. 773, 781 (1993), *aff'd*, 35 F.3d 1535, 1543 (1994).   Moreover, the Commission notes that "it is entirely appropriate for the ITC to 'weigh all the evidence before it and resolve conflicts in the evidence.'"  *Id*. citing *Ranchers-*

*Cattlemen Action Legal Foundation v. United States*, 23 CIT 861, 878, 74 F. Supp. 2d 1353, 1002-04 (1999). The ITC argues that Sensient's arguments focus on "small pieces of the record data" and that "Sensient has entirely failed to provide any persuasive evidence showing that <u>contrary</u> evidence would <u>likely</u> arise with further investigation. Instead, most of its arguments on this score consist of assertions that there is a <u>possibility</u> that <u>further</u> evidence <u>may</u> arise." *Id*. at 8 (emphasis in the original).

Substantively, the ITC argues that there was no reasonable indication of material injury from the subject imports because the volume of imported allura red was very small and remained so throughout the period of investigation. Furthermore, the ITC found no correlation between import pricing trends and declines in domestic prices. Import prices "trended upward" while prices for domestic allura red "fluctuated" but generally "trended downward." *Id*. at 10. The ITC also noted that "{t}he domestic industry's gross profits, operating income, operating income ratios and net income all <u>increased</u>, 'with the industry enjoying strong operating income and positive income ratios each of the three years' examined." *Id*. (emphasis in the original). The ITC found that the domestic industry's production levels also increased substantially during the period of investigation and shipments and capacity utilization also increased during this period. Thus it concludes that, contrary to Sensient's assertions, the decision to issue a negative preliminary determination was neither arbitrary nor capricious, but was in fact supported by clear and convincing evidence.

The ITC also addresses particular issues raised by Sensient. First, regarding the lost sales, the ITC notes that "lost sales alone do not mandate a finding of injury; rather it is for the ITC to determine whether lost sales, together with other factors, indicate a causal nexus between {less than

fair value} imports and material injury to the domestic industry." *Id*. at 12 quoting *Lone Star Steel Co. v. United States*, 10 CIT 731, 734, 650 F. Supp. 183, 186 (1986).  Thus lost sale allegations do not offset the weight of other evidence showing that the subject imports did not have a significant impact on the domestic industry.  Furthermore, the ITC points out that the total volume of the alleged lost sales that were not completely denied by purchasers was "only {a minimal percentage} of total consumption in the allura red market in 2001 and . . . 2003." *Id*. at 13.   The corresponding lost revenue attributable to these sales is "less than {one} percent of the industry's total sales for 2002." *Id*.  The ITC states that it weighed the evidence of lost revenue in its pricing analysis.

Turning to the issue of the allegedly flawed import data, the ITC asserts that it did not rely on the data from Customs that the national import specialist considered erroneous.  Instead, the ITC relied on importer questionnaire responses which covered all of the subject imports.  The ITC states that "{n}othing in the record indicated that the importers had misrepresented their import data in their questionnaire responses." *Id*. at 15.  Contrary to Sensient's allegation, "the export volumes reported by the Indian producers closely track the import data reported by importers of the subject merchandise." *Id*. at 16.  The ITC contends that there was no more accurate source of data and asserts that it properly considered the volume of imports and their effect on the U.S. market.

The ITC also disagrees with the information Sensient cites as other evidence of material injury.  The ITC claims that the record showed that the allura red industry was able to increase its aggregate capacity levels and capacity utilization rates during the period of investigation.  While the number of workers decreased slightly, wages paid and hours worked increased.  Although Sensient claims it was unable to use the equipment it acquired when another domestic allura red producer

exited the business, the ITC contends that Sensient actually acquired the producer to obtain patented technology to produce an extruded form of allura red and that it continued to produce the extruded allura red even after it shut down the facility. For all of these reasons, the ITC maintains its position that the domestic industry was not materially injured by imports of allura red from India.

The ITC also counters Sensient's arguments that the domestic industry was threatened with material injury. The ITC points out that it considered the Indian export subsidies and found no indication that they would lead to increased exports to the U.S. in the imminent future since several of the subsidies had existed since the early 1980's, but had not resulted in significant exports of allura red. As discussed previously, the ITC also disagrees with Sensient's contentions that the record showed a significant increase in market penetration, suggesting a threat of a significant increase in import volumes; that importers were causing domestic prices to decline; that it failed to take into consideration the excess capacity of the Indian producers; and that an Indian producer was likely to win the allura red contract from one of Sensient's largest customers.

Finally, the ITC argues that it complied with the governing statute and regulations and Sensient's rights to participate in the investigation were not curtailed.

> Sensient provided questionnaire responses, participated in an evidentiary conference before the ITC staff, presented witness testimony, legal argument, and documentary evidence, and submitted briefs (petition and post-conference) to the ITC "containing information and arguments pertinent to the investigation."

*Id*. at 23. The Commission notes that this Court has held that "parties to antidumping and countervailing duty investigations do not have a right to review and comment on all information relied on by the agency in its determination." *Id*. at 24 citing *General Motors Corp. v. United States*,

17 CIT 697, 827 F. Supp. 774 (1993); *Acciai Speciali Terni, S.P.A. v. United States*, 19 CIT 1051 (1995); *Gulf States Tube Division of Quanix Corp. v. United States*, 21 CIT 1013, 1039, 981 F. Supp. 630, 652 (1997); *Avesta AB v. United States*, 12 CIT 493, 510-11, 698 F. Supp. 1173, 1188 (1988). Moreover, Sensient was served with questionnaire responses from three out of the four importers, who accounted for the largest percentage of the subject imports, the week before Sensient filed its brief with the ITC. *Id*. at 25. Thus it was able to comment on the questionnaire responses of the importers who accounted for most of the subject merchandise before the ITC issued its preliminary determination. The ITC notes that Sensient has not made any argument before this Court that they did not make at the administrative level; thus demonstrating that they had sufficient information to comment fully. Transcript of Oral Argument (Mar. 2, 2004) at 19.

Finally, the ITC argues that Sensient misinterprets the statutes and regulations pertaining to the Commission's release of business proprietary information. First, 19 U.S.C. §§ 1677f(c)(1)(A) and 19 C.F.R. §§ 207.7(a)(1) provide only that the ITC "shall" make the information available, but does not guarantee parties the right to comment on that information before the ITC votes. *Id.* at 21. As an example of this, 19 C.F.R. § 207.17 provides that the ITC staff report, which Sensient claims was wrongfully withheld, is to be released after the preliminary determination. *Id*. at 21-22. Furthermore, the ITC contends that the seven day period provided by 19 U.S.C. §§ 1677f(c)(1)(C) is only for determining whether to grant an application submitted by an interested party for access to business proprietary information. *Id*. at 33-34. For these reasons, the ITC concludes that Sensient's due process rights were not violated.

### *Discussion*

The Court reviews decisions by the ITC to determine whether they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(A). In *Ranchers-Cattlemen Action Legal Foundation v. United States*, 23 CIT 861, 878, 74 F. Supp. 2d 1353, 1369 (1999), the court noted that it "may only reverse the ITC's determination if there is a 'clear error' of judgment and . . . 'no rational nexus between the facts found and the choices made.'" The ITC is charged to examine whether "there is a reasonable indication that an industry in the United States . . . is materially injured, . . . or is threatened with material injury" by imports of the subject merchandise, 19 U.S.C. § 1673b(a)(1)(A)(i)-(ii), and it may only make a negative preliminary determination when "(1) the record as a whole contains clear and convincing evidence that there is no material injury or threat of such injury; and (2) no likelihood exists that contrary evidence will arise in a final investigation," *American Lamb Co. v. United States*, 785 F.2d 994, 1001 (Fed. Cir. 1986). Nevertheless, "in applying the statutory standard for making a preliminary determination . . . the Commission may weigh all evidence before it and resolve conflicts in the evidence." *Ranchers-Cattlemen*, 23 CIT at 878, 74 F. Supp. at 1368 citing *American Lamb* 785 F.2d at 1002-04.

In the present case, the Court is satisfied with the explanation set forth by the ITC and, taking the record as a whole, finds clear and convincing evidence to support the ITC's conclusion that the domestic industry was neither materially injured nor threatened with material injury by the imports of allura red from India. Of particular, but not exclusive, significance to this determination is the fact that the domestic industry retained dominance over the U.S. market throughout the period of investigation. Although Sensient argued extensively that the information the ITC based this on was

flawed, the Court cannot re-weigh the evidence that was before the Commission, nor can it speculate that contrary evidence would have likely arisen had the investigation continued.

The Court also finds that Sensient was afforded due process during the ITC's investigation and preliminary determination.  It is undisputed that Sensient received copies of the questionnaire responses covering the vast majority of the subject imports prior to submitting its brief to the ITC, *see* Pl.'s Reply Br. at 13, and at oral argument Sensient's counsel did not deny in its rebuttal the ITC's assertion that Sensient was able to make the same arguments before the Commission that it raised before the Court, *see* Tr. at 31-32.  Furthermore, the Court agrees with the ITC's construction of 19 U.S.C. §§ 1677f(c)(1)(A) and (C) and holds that the 7 day period provided by subpart (C) is not a time limit for releasing individual documents to the parties, but is a time limit for making a determination on whether to grant or deny a party's application for access to business proprietary information.  In light of this, the ITC's regulations and established practice for releasing information are not at odds with the statute.  Accordingly, the Court finds that Sensient was afforded a meaningful opportunity to participate in the proceedings before the ITC.  *See Chung Ling Co., Ltd. v. United States*, 23 CIT 829, 837, 829 F. Supp. 1353, 1361 (1993) ("{n}otice and an opportunity to be heard are the foundations of due process of law").

*Conclusion*

For the foregoing reasons, the Court holds that the ITC's negative preliminary determination in *Allura Red Coloring from India*, 68 Fed. Reg. 20,170 (Apr. 24, 2003) was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, but was instead supported by clear and convincing evidence. Therefore, Sensient's motion for judgment on the agency record is denied and the ITC's preliminary determination is sustained.

                                                   /s/ R. Kenton Musgrave
                                               R. KENTON MUSGRAVE, JUDGE

Dated: September 10, 2004
       New York, New York