ACCIAI SPECIALI TERNI, S.P.A., ILVA S.P.A. (IN LIQUIDATION), AND ILVA USA, INC., PLAINTIFFS *v.* UNITED STATES, DEFENDANT, AND ALLEGHENY-LUDLUM CORP., ET AL., DEFENDANT-INTERVENORS

Consolidated Court No. 94–07–00398

(Dated August 7, 1995)

*Rogers & Wells (William Silverman, Douglas J. Heffner* and *Stephen J. Claeys)* for plaintiffs Acciai Speciali Terni, S.p.A.; ILVA S.p.A. (in liquidation) and ILVA USA, Inc.

*Steptoe & Johnson (Daniel J. Plaine, Edward J. Krauland, Mark A. Barnett, Maury D. Shenk* and *Kent D. Bressie)* for plaintiffs Nippon Steel Corporation and Kawasaki Steel Corporation.

*Lyn M. Schlitt,* General Counsel, *James A. Toupin,* Deputy General Counsel, Office of the General Counsel, United States International Trade Commission *(James M. Lyons)* for defendant.

*Collier, Shannon, Rill & Scott (David A. Hartquist, Michael J. Coursey, Kathleen W. Cannon* and *Mary T. Staley)* for defendant-intervenors Allegheny-Ludlum Corp.; Armco, Inc.; the Butler Armco Independent Union; the United Steelworkers of America; and the Zanesville Armco Independent Union.

## OPINION

RESTANI, *Judge:* This matter is before the court on the parties' cross-motions for judgment upon the agency record, which challenge the affirmative material injury determination by the United States International Trade Commission ("ITC" or "Commission") with respect to certain grain-oriented silicon electrical steel ("GOES") from Italy and Japan that was found to be subsidized and/or sold at less than fair value ("LTFV"). *Grain-Oriented Silicon Electrical Steel from Italy and Japan,* USITC Pub. No. 2778, Inv. Nos. 701–TA–355 and 731–TA–660 (May 1994) (final affirmative determ.) *("Final Det.")*[1] and *Grain-Oriented Silicon Electrical Steel from Italy,* USITC Pub. No. 2800, Inv. No. 731–TA–659 (Aug. 1994) (final affirmative determ.); 59 Fed. Reg. 28,561 (USITC 1994) (final) and 59 Fed. Reg. 42,285 (USITC 1994) (final) respectively.

## I. FACTS

Defendant-intervenors Allegheny-Ludlum Corporation, Armco, Inc., the Butler Armco Independent Union, the Zanesville Armco Independent Union, and the United Steelworkers of America are domestic manufacturers of GOES products, or unions related to the manufacture of these products. GOES, a flat-rolled steel product, is used in the manufacture of the cores of power and distribution transformers, as well as specialty transformers. *Final Det.* at II–4 *("Pub. Staff Rpt.").* GOES is sold in sheet or strip form and possesses superior magnetic

---

[1] The Commission made two determinations because the United States Department of Commerce postponed its final determination of LTFV sales relating to imports from Italy. The ITC's statements in the determinations are identical, thus from hereon the court cites only to the Commission's first determination concerning GOES.

properties, including higher permeability and lower core loss, which make it a more efficient conductor than non-grain-oriented silicon electrical steel. *Id.*

GOES is differentiated by grades, with specifications that identify separate core-loss designations for conventional and high-permeability product types.[2] *Id.* at II–5. Within each grade, the average core loss of a product may vary from producer to producer. *Id.* Transformer manufacturers diverge in their approach to assessing a grade of GOES for purchase. Manufacturers of industrial transformers generally do not evaluate core-losses, and usually select M–6 grade. *Id.* at II–30. Power and distribution transformer bids that are solicited by utility companies are evaluated by a "total ownership cost" ("TOC") model. *Id.* at II–30–II–31. Utilities usually do not specify the grade of GOES required for use in a transformer design, but rather indicate other characteristics that affect a transformer manufacturer's selection of grade, such as the amount, in dollars per watt, at which core loss and windings loss are evaluated by the utility, maximum limits for loss, impedance, and weight. *Id.* at II–31. As a result, nearly all transformers sold to utilities are custom-designed to meet the requirements contained in a utility company's request for quotes. *Id.*

Some GOES, mostly M–6 grade, is used predominantly by stampers to punch laminations for use in equipment employing smaller transformers, such as appliances and aerospace, aeronautical and electronic equipment.[3] *Id.* at II–8. In general, the production process varies for high-permeability GOES as compared with conventional GOES. *Id.* For instance, in the manufacture of high-permeability permanently domain-refined ("PDR") GOES, the product is etched by laser to improve magnetic properties, and further coated to improve electronic resistance. *Id.* at II–6 & n.25, II–8.

A. *Parties' contentions:*

On August 26, 1993, defendant-intervenors filed with the Commission and the International Trade Administration of the United States Department of Commerce ("Commerce") their petitions alleging that the domestic GOES industry was materially injured or threatened with material injury by reason of subsidized and/or LTFV imports from Italy and Japan. In October 1993, the Commission made preliminary determinations, finding there existed a reasonable indication that the domestic industry producing GOES was materially injured or threatened with material injury by reason of the subject imports from Italy and Japan. The Commission published the final results of its investigations on June 2, 1994 and August 17, 1994, respectively.

---

[2] The grades M–2 through M–6 are assigned to various gauges of conventional grade GOES with low energy efficiency. *Pub. Staff Rpt.* at II–5 & n.12. The grades M–0H through M–4H apply to high-permeability grade GOES with lower core losses. *Id.*

[3] Within the grade of M–6 GOES, there is a distinction between "shearing" quality and "punching" quality. All M–6 grade GOES begin as shearing quality, as the product exists in standard width coil form to be later slit and cut to length. *See* Def.'s App. to Mem. & n.41. in Opp'n to Pls.' Mots. J. Agency R., Conf. Doc. 7, at 41 & n.41. Punching quality M–6 is shearing quality M–6 that has undergone an additional pickling process. *Id.*

Motions for judgment upon the agency record pursuant to USCIT Rule 56.2 have been filed by (1) Acciai Speciali Terni, S.p.A., ILVA S.p.A. (in liquidation) and ILVA USA, Inc. (collectively "Acciai Speciali" or "Acciai"), and (2) Nippon Steel Corporation and Kawasaki Steel Corporation (collectively "Nippon Steel"), contesting portions of the determination. Acciai Speciali challenges the Commission's causation analysis with respect to volume and price effects of imports from Italy. Nippon Steel argues in its motion that the Commission failed to undertake a segmented analysis as to Japanese imports, and also challenges the Commission's causation analysis as to volume and price effects of imports from Japan. Lastly, Nippon Steel asserts a deprivation of its right to due process. Nippon Steel specifically challenges the Commission's rejection of Nippon Steel's comments sent in response to information submitted by domestic producers late in the investigation. Defendant and petitioners oppose these motions.

## B. *ITC's determination:*

The majority of the Commission found that imports from both Italy and Japan caused material injury.[4] The Commission noted that nearly all of the Italian imports consisted of low-efficiency conventional grade M–6 GOES, while the majority of Japanese imports was composed of high-permeability GOES. *Final Det.* at I–12–I–13. The Commission concluded that the low-efficiency Italian M–6 grade and the Japanese high-permeability GOES were not sufficiently fungible to support a finding of a reasonable overlap of competition, thus the Commission did not cumulate the subject countries' imports for purposes of assessing present material injury. *Id.* at I–13–I–14.

With regard to Italian imports, the Commission found that volume increased over the period of investigation ("POI") in both absolute and relative terms, while total apparent domestic consumption declined. Def.'s App. to Mem. in Opp'n to Pls.' Mot. J. Agency R., Conf. Doc. 57, at I–15 *("Conf. Final Det.")*. The Commission noted that several large purchasers had indicated they would have purchased domestic grade M–6 GOES if the imported price had increased by as little as 5 percent. *Final Det.* at I–15. The Commission found evidence of underselling, and determined that, when combined with a steady decrease in price of Italian imports, depression of prices for M–6 GOES resulted, causing domestic prices in 1993 to dip below 1990 levels. *Id.* The domestic industry's market share declined throughout the period, from just under 80 percent in 1990 to below 74 percent in 1993. Def.'s App. to Mem. in Opp'n to Pls.' Mot. J. Agency R., Conf. Doc. 56, at II–51 tbl. 17 *("Conf. Staff Rpt.")*; *see Conf. Final Det.* at I–15. With regard to the impact upon the domestic

---

[4] Four commissioners participated in the determinations relating to imports from Italy. The plurality opinion was joined by Commissioners Rohr and Nuzum. Commissioner Newquist's separate material injury determination in which he cumulated Japanese and Italian imports is not challenged here. *See Final Det.* at I–12 n.66. Commissioner Crawford dissented from the determination of material injury caused by reason of imports from Italy. *Id.* at I–3 n.2.

Five commissioners participated in the determination relating to Japan. All commissioners concurred in the finding of material injury to the domestic injury by reason of Japanese imports. Commissioners Crawford and Newquist made separate additional determinations.

industry, the Commission observed reduced revenue, a decline in domestic production and capacity utilization, and higher production costs, plus a decline in domestic shipment volume and market share. *Final Det.* at I–16.

The Commission also found that with regard to Japanese imports, volume increased over the POI, with the largest increase in 1993, while total apparent domestic consumption declined during the POI. *Id.* Although the market share for Japanese imports declined in 1993, the Commission ascribed this result to reduced U.S. shipments of Japanese imports, rather than to lower Japanese imports overall. *Id.* The Commission found evidence of underselling in two product categories in which the domestic and subject imports were most directly competitive.[5] For M–3 grade GOES, Japanese import prices were found to decline at a faster rate than prices for domestic M–3, which coincided with a decline in the financial performance of the domestic industry. *Id.* at I–17. Purchaser prices for Product 4, the highest volume high-permeability grade of Japanese GOES, were found to show consistent underselling throughout the period, with an increasing margin of underselling between 1991 and 1993. *Id.* The Commission determined that lower domestic production volumes and capacity utilization percentages reflected reduced market share for the domestic industry, and that price underselling by nearly one half of the quantity of Japanese imports suppressed domestic producers' ability to raise prices and resulted in losses in 1992 and 1993. *Id.*

## II. Standard of Review

The scope of review of an ITC determination is whether it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988) (current version at 19 U.S.C.A. § 1516a(b)(1)(B)(i) (West Supp. 1995)). The court cannot substitute its judgment for that of the agency, nor may it reweigh the evidence. *R-M Indus., Inc. v. United States,* 848 F. Supp. 204, 207 (Ct. Int'l Trade 1994).

## III. Discussion

To determine whether material injury is caused by LTFV or subsidized imports under investigation, ITC is required to consider the volume of imports, their effect and impact on domestic prices and production, and other relevant economic factors. *See* 19 U.S.C. § 1677(7)(B) (1988). The Commission, in its evaluation of the volume of imports under investigation

> shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant.

---

[5] Pricing Product 3 consisted of data for M–3 grade or conventional GOES. *Conf. Staff Rpt.* at II–54. Pricing Product 4 consisted of data for high-permeability domain-refined GOES for stacked core applications. *Id.* Pricing Product 5 consisted of data for high-permeability non-domain-refined GOES, while pricing Product 6 consisted of high-permeability PDR GOES, and both products were used in wound core applications. *Id.*

19 U.S.C. § 1677(7)(C)(i). In its analysis of price effects of imports on domestic prices, the Commission must consider whether

(I) there has been significant price underselling by the imported merchandise as compared with the price of like products of the United States, and

(II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

*Id.* § 1677(7)(C)(ii). For the examination of the impact of imports, the statute requires that the Commission evaluate all relevant factors, including, but not limited to,

(I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,

(II) factors affecting domestic prices,

(III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment, and

(IV) actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the like product.

*Id.* § 1677(7)(C)(iii) (current version at 19 U.S.C.A. § 1677(7)(c)(iii) (West Supp. 1995)). Section 1677(7)(C)(iii) also requires the Commission to evaluate those relevant economic factors described within the context of the business cycle and conditions of competition. *Id.* The court will discuss each contention raised by the parties.

A. *Material injury caused by Italian imports:*

Acciai asserts that the Commission failed to provide a reasoned causation analysis, that is, it failed to explain how the increased volume and market share of imports of the subject merchandise from Italy caused the loss of domestic producers' market share. Acciai argues further that the Commission's findings as to price suppression and depression caused by Italian imports are not supported by evidence in the record. Defendant and defendant-intervenors support the Commission's determination.

1. *Volume effects:*

With regard to the adequacy of the Commission's discussion concerning volume effects, Acciai contends that the majority's analysis failed to establish a rational connection between the increase in Italian imports and the resultant injury to the domestic industry. Acciai asserts that evidence in the record contradicts the alleged presumption made by the Commission that increases in Italian import volume and market share were related to losses experienced in the domestic industry.

The Commission determined that the increased volume and market share for Italian imports were significant, in light of the relative inter-

changeability of the domestic product and subject imports, the reduction in apparent domestic consumption, and the decline in domestic market share. *Conf. Final Det.* at I–15; *see Conf. Staff Rpt.* at II–50. The Commission noted that the majority of Italian imports consisted of M–6 grade, and these imports were used interchangeably with domestic product. *Final Det.* at I–15. The Commission also found that competition with imports was to a significant degree based upon price, and that Italian import prices were lower than domestic prices during the POI. *Id.* With these factors in mind, the Commission observed that during the POI, the volume of Italian imports increased by more than one third, market share grew substantially, and the largest increase in volume occurred in 1993. *See Conf. Staff Rpt.* at II–48 tbl. 16, II–51 tbl. 17.

Acciai does not challenge the volume and price data upon which the Commission relied, but rather argues that the Commission ignored evidence in the record that was contradictory to a finding of a causal link between the subject imports and the condition of the domestic industry. Specifically, Acciai relies upon the lack of confirmed lost sales experienced by domestic producers, the cessation of one domestic producer's manufacture of M–6 grade product, and assessments concerning market share reached by Commission staff contained in an economic memorandum supplied to the Commission. Acciai also argues that the Commission's finding that price was an important factor was contradicted by purchaser questionnaire responses.

### a. Lost sales evidence:

Acciai asserts that because lost sales evidence often supports a finding of a causal link between the volume of imports and decline in domestic industry market share, absence of such evidence invalidates a finding that imports displaced domestic products. Here, two U.S. producers alleged 11 instances of lost sales due to Italian imports, but none of these allegations could be confirmed as resulting from import pricing. *Conf. Staff Rpt.* at II–73–II–76.

The court does not agree with Acciai's reasoning. First, anecdotal lost sales evidence is difficult to gather. Purchasers have little incentive to confirm allegations. Second, in *Gifford-Hill Cement Co. v. United States,* 9 CIT 357, 367–68, 615 F. Supp. 577, 585 (1985), this court determined that the Commission was not required to "rest its decision on either lost sales or lost revenues," because these "may be only two possible signals of impact." This court also noted that "[n]either the presence nor the absence of any factor listed in [19 U.S.C. § 1677] can necessarily give decisive guidance with respect to an injury determination." *Id.* at 368 n.12, 615 F. Supp. at 585 n.12. Rather, for fungible products it is volume that may demonstrate best any evidence of domestic producers' lost sales. *Id.* at 368, 615 F. Supp. at 586. Here, it is clear that the Commission reviewed volume data in connection with evidence of trends in domestic consumption, price and domestic shipments. The Commission

was not in error in not finding the lack of confirmed lost sales evidence determinative.

b. Reduction in domestic production:

Acciai also contends that the Commission failed to find a correlation between the decrease in domestic producers' market share and the cessation of M–6 production by one producer, as supported by evidence from certain U.S. purchasers. Allegedly, as a result one U.S. customer increased its import purchases to maintain a source of supply. Acciai contends that the producer at issue was forced out of business because of competition from another domestic producer, rather than competition from lower-priced Italian imports. Defendant responds that the timing of the U.S. producer's withdrawal from M–6 production does not correlate with volume and market share data. Defendant-intervenors insist that other evidence in the record indicates that the U.S. producer ceased M–6 production as a result of import pricing, and an inability to receive commitments from a U.S. purchaser for sufficient purchase quantities to warrant production.

Acciai further claims that an additional explanation for the increase in Italian imports is that another U.S. customer increased its purchases as a result of a domestic producer's refusal to supply certain quantities of shearing quality steel. Defendant maintains that the evidence does not support this explanation either.

Evidence before the Commission regarding cessation of production was conflicting. The relevant U.S. producer discontinued manufacture of M–6 grade during the second half of 1993. *See* List 2, Doc. 47, Attach. D (letter from U.S. producer to U.S. purchaser dated May 5, 1993 indicating end date for production). The evidence indicates that from 1990 up to 1993, this producer lost all but one of its customers that purchased punching quality steel, and in 1993 the producer requested a quantity commitment from the remaining customer in order to continue production. Def.-Ints.' App. to Mem. in Opp'n to Pls.' Mot. J. Agency R., Tab 3, at 35–36 (Tr. of Apr. 12, 1994 proceedings before ITC). This customer did not agree to purchase the M–6 grade quantity proposed. *See* List 2, Conf. Doc. 47, Attach. D; Acciai's App. to Mem. in Supp. Mot. J. Agency R., Tab 7, at 2–3. In its questionnaire response, this same customer indicated that it had increased its purchases of Italian M–6 grade product significantly in 1991 and 1992. Def.'s App. to Mem. in Opp'n to Pls.' Mots. J. Agency R. ("Def.'s App."), Conf. Doc. 64.46, at 7. Thus, there is substantial evidence that sales were lost to imports, rather than to other domestic producers. In its determination, the Commission cited to the testimony of the U.S. producer to support its related conclusion that apparent domestic consumption was in decline, and that there was decreased demand for the domestic M–6 grade. *Final Det.* at I–16 & n.100.

As to the increased purchase of imported shearing quality M–6, the customer's questionnaire response is not consistent with its claim that

its domestic purchases fell off due to the domestic producer's refusal to supply. The questionnaire data indicates that the customer's domestic purchases overall, for both punching grade and shearing quality steel, fell dramatically between 1990 and 1993, at the same time that its purchases of Italian imports more than doubled. Def.'s App., Conf. Doc. 64.39, at 7, 26–27. Further, as early as 1990, this purchaser bought shearing quality steel from the Italian producer in large quantities as compared with its domestic purchases. *Id.* at 27. Thus, the Commission's finding on this issue is supported by substantial evidence.

### c. Economic memorandum:

In connection with a quantitative analysis of the effects of dumped and subsidized imports upon the domestic GOES industry, the Commission staff prepared a memorandum for the Commission, which, *inter alia*, estimated the market share percentage for domestic products in the absence of Italian imports. Economic Mem. to Commission from International Economist, List 2, Doc. 54 (EC–R–051), at 32, 34 tbl. 1 (May 16, 1994). The Commission staff indicated that the estimated market share was close to the actual domestic market share in 1993. *Id.* Thus, according to this estimate, domestic producers would have gained little or no market share if Italian imports were not present in the market.

The economic memorandum was formulated prior to the issuance of Commerce's final determinations of dumping margins, which were higher for Italian imports than were the estimated margins used in the economic memorandum. *See Grain-Oriented Electrical Steel from Italy,* 59 Fed. Reg. 33,952 (Dep't Comm. 1994) (final determ. of LTFV sales). The Commission did not cite to this memorandum in its majority determination,[6] but rather relied upon more current record evidence in support of its finding of volume effects based upon displacement of domestic industry shipments. Acciai asserts that the assessment of the evidence in the memorandum, which was submitted to the Commission, is binding.

The court finds that Acciai's view of the weight of the interpretations of data contained in the memorandum is too restrictive. Were the Commission to be bound by each of its preliminary observations made by staff concerning data, the Commission's ability to apply a variety of analyses would be likely limited. This memorandum was one of many documents the Commission had available to it in assessing the record data, and the Commission possesses considerable discretion to assign weight to any given factor in reaching its injury determination. *See USX Corp. v. United States,* 12 CIT 844, 846–47, 698 F. Supp. 234, 237 (1988). The Commission considered the impact of Italian imports in conjunction with its observations concerning the relative substitutability between imports and the domestic product. *See Final Det.* at I–15. It was

---

[6] Commissioner Crawford, in her dissent, relies upon this memorandum for purposes of discussing the elasticities of demand, substitution, and domestic supply for the subject imports. *Final Det.* at I–26–I–27 & nn.147–51.

not unreasonable for the Commission to reach a conclusion regarding impact of imports, based upon the facts in the record, that varied from the theoretical economic model used by staff. Thus, the Commission's findings concerning volume and causation are not undermined significantly by the analyses contained in the staff memorandum.

d. Importance of price and substitutability:

The court finds that the majority performed a reasoned analysis of the relationship between the increase in volume and market share of Italian imports and the concurrent decline in domestic product volume and market share. Directly related to this analysis were the Commission's findings concerning the importance of price and the level of substitutability among domestic and imported GOES products. The Commission observed that certain purchasers of a large quantity of M-6 grade indicated that price was a determining factor in their purchase decisions. *Id.* The Commission acknowledged that several large purchasers of GOES stated in questionnaire responses that an increase in import price by as little as 5 percent would be motivation to switch to domestic products. *Id.*

Acciai Speciali asserts that the Commission's finding as to the importance of price is exaggerated, because the only two purchasers of M-6 that might meet the Commission's description noted elsewhere in their questionnaire responses that factors other than price were also important to their purchase decisions. Acciai Speciali further argues that these purchasers accounted for less than one third of the purchases by volume made over the POI. Defendant responds that Acciai Speciali's characterization of the data is misleading, as these purchasers bought nearly 50 percent of total Italian imports in 1993, and more than 50 percent of the *increase* in imports over the entire period. *See Conf. Staff Rpt.* at II–67; Def.'s App., Conf. Doc. 64.34, at 7 ("Conf. Doc. 64.34"); Conf. Doc. 64.37, at 7 ("Conf. Doc. 64.37"). During the POI, these same purchasers also significantly reduced their purchases of domestic products. *See* Conf. Doc. 64.34, at 7; Conf. Doc. 64.37, at 7.

The Commission's findings concerning the importance of price are supported by the evidence. The two purchasers of M-6 referred to above indicated in their questionnaire responses that a 5 to 10 percent rise in import price would cause them to purchase domestic products. *See* Conf. Doc. 64.34, at 22; Conf. Doc. 64.37, at 22. Acciai Speciali emphasizes that these purchasers in particular, as well as other purchasers, did not list price as the most important factor in their decisionmaking, thus the Commission's analysis on this point is flawed and impairs its causation analysis. The court does not agree. While it is an accurate statement that these and other M-6 purchasers did not list price as the most important factor, price was listed as a very important factor. *See* Def.-Ints.' App. to Mem. in Supp. Mot. J. Agency R. at Tab 1 (purchaser responses to question IV.6, at 20).

Further, one of the two large purchasers stated that it found the quality of domestic and imported products to be comparable. Conf. Doc. 64.37, at 21. This purchaser listed price as an important factor after product quality and timely delivery, *id.* at 12, but the purchaser also stated that it would switch supply in the event of a 10 percent increase in import price. *Id.* at 22. Although one might argue that this document is somewhat internally inconsistent as to the weight given to price by this purchaser, to the court the document appears supportive of the Commission's conclusion.

### 2. *Price depression and suppression:*

Acciai Speciali argues that the Commission's analysis of price effects is also flawed. Acciai asserts that the Commission's conclusions are not supported by the record. Further, Acciai contends that the price data undermines the Commission's price suppression analysis, because domestic producers were able to increase M–6 prices in several instances during the period. Also, Acciai alleges that evidence in the record contradicts the Commission's finding that domestic producers were unable to cover their increasing production costs due to price pressure from Italian imports. Defendant and defendant-intervenors contest all of these assertions.

The Commission found that in price comparisons for both categories of M–6 grade GOES, Italian imports undersold domestic product in 27 of 30 quarters, and the highest margin of underselling was over 15 percent. *Final Det.* at I–15. The margin of underselling frequently exceeded the 5 to 10 percent price increase certain purchasers stated they could absorb. The Commission determined that this underselling, in combination with steady decreases in import price, depressed domestic prices to a level lower than that of 1990. *Id.* The Commission noted that purchaser information demonstrated that the margin of underselling increased substantially over the period. *Id.*

Regarding the Commission's price depression finding, Acciai mischaracterizes the importance of the pricing data, and misinterprets the Commission's support for its conclusions. Acciai's first argument is based in part upon a quarter-by-quarter comparison of prices for two M–6 pricing products, to identify any decreases in domestic price in response to a decrease in import price in the prior quarter. *See* Acciai's Mem. in Supp. Mot. J. Agency R. at Attach. 1 (charts of weighted-average net price and delivered price data contained in *Conf. Staff Rpt.*, II–56–II–57 tbls. 18, 19; App. I, tbls. I–1, I–2). The data indicate that for pricing Product 1 (punching quality), of which the majority of M–6 imports is comprised, domestic price fluctuated slightly, and decreased overall. *Conf. Staff Rpt.* at II–56 tbl. 18. The data for pricing Product 2 (shearing quality) indicate greater fluctuations in price. *Id.* at II–57 tbl. 19. Both sets of data support the prevalence of underselling by Italian imports. The quarterly data do not show that domestic prices decreased consistently in response to import pricing. As defendant has noted, how-

ever, there is no requirement that the Commission assess the price-depressing or suppressing effects of imports in any particular manner. *Cemex, S.A. v. United States,* 16 CIT 251, 261, 790 F. Supp. 290, 299 (1992), *aff'd without op.,* 989 F.2d 1202 (Fed. Cir. 1993). In this instance, the fact that domestic price changes were not synchronous with changes in import pricing does not establish a lack of price effects. Pricing changes may be delayed or may occur in part due to other factors.

Acciai's second argument is that the Commission's statements about price depression are supported by weak evidence. In its discussion of price effects, the Commission cited to several portions of the Staff Report. *See Final Det.* at I–15 nn.98–99. These portions include text of the Staff Report discussing the underselling data contained in Tables 18 and 19, purchasers' comments from questionnaire responses regarding amounts of increases in import pricing that would cause purchasers to switch to domestic supply, and lost sales and revenue allegations. *Id.* The lost revenue allegation referred to was confirmed by Commission staff, although the lost sales allegations were not. It is clear, however, that even without reference to anecdotal evidence, the Commission's assessment of underselling and price depressing effects is supported by the weighted-average price data from producers and importers, and the purchaser price data. *See Conf. Staff Rpt.* at II–56–II–57 tbls. 18, 19; App. I, tbls. I–1, I–2.

For the same reasons, Acciai's objections to the Commission's price suppression analysis also fail. Merely because domestic producers were able to increase M–6 prices in several instances during the period does not undermine the importance of data demonstrating consistent underselling. The data clearly substantiate that the domestic industry was unable to sustain a price increase because of price pressure from lower priced imports. Acciai emphasizes that the evidence of some price increases contradicts the Commission's determination that Italian imports "prevented, to a significant degree, the domestic producers from increasing prices as their cost of goods increased." *See Final Det.* at I–15. The court finds Acciai's reading of the Commission determination too narrow, as the Commission did not state that producers were unable to increase prices in every instance.

Acciai also points to other evidence that contradicts the Commission's conclusion. Acciai construes portions of the Staff Report to show that domestic producers were unable to cover increasing costs because of yield problems associated with high-permeability products, reduction in export sales, and increased depreciation costs. *See Conf. Staff Rpt.* at II–30, II–33–II–34. The Commission considered this evidence in reaching its determination, *see Final Det.* at I–11 nn.56 & 60, but still concluded that the subject imports were a cause of material injury. Although Acciai offers its alternative view of the evidence, including the pricing data, the Commission's determination is supported by substantial evidence, and will not be disturbed. *See Matsushita Elec. Indus. Co. v. United States,* 750 F.2d 927, 936 (Fed. Cir. 1984) (finding role of court

is not to decide whether it would reach same decision as ITC on basis of evidence).

B. *Material injury caused by Japanese imports:*

Nippon Steel also argues that the Commission failed to provide a reasoned causation analysis. Specifically, Nippon argues that the Commission failed to consider market segmentation as a condition of competition. Nippon further alleges that the Commission erred in its analysis of volume and price effects, and disregarded certain record evidence relevant to its causation analysis. Defendant and defendant-intervenors oppose each of these assertions.

1. *Market segmentation:*

Nippon Steel alleges that the Commission discussed import volumes and price effects without acknowledging a critical feature of competition in the GOES market. Nippon Steel maintains that the GOES market is divided into two segments with dramatically different trends: high-permeability GOES and conventional GOES, which includes grades M6 through M2. Nippon Steel asserts that the existence of these two market segments precludes a finding of significant competition between Japanese imports and the domestic like product. Defendant and defendant-intervenors argue that the Commission properly did not make a finding of different market segments, thus the Commission was not in error in declining to evaluate volume and price effects only within the segment of high-permeability GOES.

During the investigations, the Commission considered whether high-permeability and conventional grades of GOES constituted one like product.[7] *Final Det.* at I–6. The Commission determined that the evidence supported a finding of a single like product, as there were no clear dividing lines among different grades of GOES. *Id.* at I–8. The Commission found that to a certain degree grades of GOES were interchangeable, within one grade level above. *Id.* at I–7. The Commission also determined that most Japanese imports of high-permeability grade and all of imported M–3 grade steel competed directly with domestic products. *Id.* at I–16.

Nippon Steel argues that the Commission's determination was incongruous, because it recognized market segmentation in its cumulation analysis, but refused to acknowledge evidence of market segments in its causation analysis. In its cumulation analysis, the Commission indicated that because in general there was a lack of overlap of competition between the M–6 grade Italian imports and the high-permeability imports from Japan, these imports were not cumulated for material injury purposes. *Id.* at I–13, I–14; *see* 19 U.S.C. § 1677(7)(C)(iv)(I). The Commission did not articulate in its cumulation analysis that lack of overlap of competition between imports resulted in segmentation into two distinct markets. The Commission instead found that Japanese

---

[7] Nippon Steel argued in the preliminary investigations that there were two like product groups, but did not raise this argument during the final investigations. *Final Det.* at I–6 n.16.

imports were concentrated in the high-permeability grade products, while the Italian imports were concentrated in one grade of GOES. *Final Det.* at I–12–I–13. The Commission also determined that cross-grade competition existed within and between the conventional and high-permeability grades. *Id.* at I–8.

Nippon Steel relies upon *Grupo Indus. Camesa v. United States,* 853 F. Supp. 440 (Ct. Int'l Trade 1994), for the proposition that the Commission was required here to discuss market segmentation in its causation analysis. The court in *Grupo,* in upholding the Commission's determination, found that the Commission had considered but declined to adopt the segmented market argument presented, on the basis that a reasonable degree of direct competition existed between the imported and domestic products at issue. *Id.* at 444.

As in *Grupo,* the court finds here that the Commission acknowledged and reasonably rejected the view that because of market segmentation the imported product did not compete with the domestic product, thus the Commission properly rejected a market segmentation approach in its causation analysis. The Commission discussed in detail its observations concerning evidence of relative substitutability and interchangeability among the various grades of GOES. *See Final Det.* at I–7–I–8. The Commission apparently determined that the domestic GOES industry manufactures a single like product, within which there are grades of GOES products along a continuum, and subject imports from two countries compete with the domestic product, although at different points along the continuum. *See id.* at I–8. This finding was not unreasonable or unsupported. Additionally, the Commission has found previously that products within a like product group may not be completely interchangeable as to end use. *See, e.g., Aramid-Fiber Formed of Poly Para-Phenylene Terepthalamide from the Netherlands,* USITC Pub. 2783, Inv. No. 731–TA–652, at I–8 (June 1994) (final); *Certain Steel Wire Rod from Brazil and Japan,* USITC Pub. 2761, Inv. Nos. 731–TA–646 and 648, at I–8–I–9 (Mar. 1994) (final).

Further, Nippon Steel has not demonstrated a requirement that where there is a single like product and, in a cumulation context, insufficient overlap among subject imports, that a segmented market analysis with regard to causation is necessarily warranted. Nippon Steel's citation to the determination in *New Steel Rails from Japan, Luxembourg, and the United Kingdom,* USITC Pub. 2524, Inv. Nos. 731–TA–557–559, at 19 (June 1992) (prelim.), does not warrant a different result. In *New Steel Rails,* the Commission expressly undertook a segmented analysis to account for a dramatic shift in overall demand from a standard rail to a premium rail product. *Id.* at 18–19 & n.90 (citing *Copperweld Corp. v. United States,* 12 CIT 148, 162, 682 F. Supp. 552, 566 (1988)). The court in *Copperweld,* however, declined to adopt plaintiffs' reasoning that price data from service centers and end users should have been weighed proportionally, noting that neither the governing statute nor its legisla-

tive history requires adoption of any particular analysis where a market may consist of several segments. 12 CIT at 162, 682 F. Supp. at 566.

The court also does not find the determination in *Certain Telephone Systems and Subassemblies Thereof from Japan and Taiwan,* USITC Pub. 2237, Inv. Nos. 731–TA–426 and 428, at 39–40 (Nov. 1989) (final), *sustained in Iwatsu Elec. Co. v. United States,* 15 CIT 44, 758 F. Supp. 1506 (1991), to be persuasive here. In *Certain Telephones,* the Commission found only one like product, but further found that the market for the subject merchandise could be subdivided into interrelated submarkets within which the nature of competition varied. *Certain Telephones,* USITC Pub. 2237, at 39–40, 43. There also, the Commission chose a segmented market analysis to account for differences in customer demand within the market. Thus, the Commission has applied a segmented market analysis in reaction to varying levels of customer demand, rather than to adjust for physical differences in the products themselves, as was the issue before the Commission here.

For these reasons, the court finds the Commission was not required to engage in a segmented market analysis in order to complete its determination as to causation properly.

2. *Volume effects:*

Concerning the adequacy of the Commission's discussion of volume effects, Nippon Steel contends that the majority's analysis is result-driven and based upon a narrow portion of the record evidence. Nippon Steel argues that the bulk of the record evidence demonstrates that changes in domestic output and sales over the POI can be explained by the significant decline in exports, a marked increase in non-subject imports, and the recession. Nippon Steel indicates that the evidence establishes that M–2 and M–3 domestic shipments, alleged to compete most strongly with Japanese GOES imports, increased during the period. Lastly, Nippon Steel contends that the Commission's market share analysis is flawed, in that for 1993 data the Commission compared Japanese entries of imports to U.S. shipments, rather than applying the shipment-to-shipment comparison used in prior investigations.

Nippon incorrectly contends that the Commission completely disregarded the evidence of other causes of injury in its causation analysis. The Commission's determination makes reference to each of the factors noted by Nippon. *See Final Det.* at I–10, I–11 n.56, I–15 n.88. As defendant correctly indicates, while various factors may have contributed to the material injury experienced by the domestic injury, the statute does not require that the subject imports be the sole cause of material injury. *United Eng'g & Forging v. United States,* 15 CIT 561, 580, 779 F. Supp. 1375, 1391 (1991).

Nippon raises two objections to the manner in which the Commission allegedly failed to analyze trends in volume for various GOES grades. Nippon first asserts that the data belies the Commission's presumption that high-permeability Japanese imports displaced the higher-effi-

ciency conventional GOES grades M–2 and M–3. Nippon Steel points to data indicating that U.S. domestic shipments of M–2 and M–3 increased during three of the four years of the POI. This portrayal of the volume data is somewhat misleading, as in 1993 domestic shipments were still below 1990 levels. *See Conf. Staff Rpt.* at F–3 tbl. F–1.

Nippon Steel's second contention is that non-subject import volume in grades M–4 and M–5, grades in which there were no Japanese imports, were the cause of decline in domestic shipments in these grades. The Commission found, however, that to some extent the M–4 grade competed with M–3 grade, thus it was not unreasonable for the Commission to consider the relationship between M–3 Japanese imports and declines in domestic shipments of M–4.

As to the Commission's market share analysis, Nippon Steel insists that the Commission failed to use a shipment-to-shipment analysis for 1993 data, and instead based its analysis upon import volume. Nippon Steel also asserts that the Commission incorrectly found that market share for Japanese imports increased in 1993. Defendant and defendant-intervenors respond that Nippon Steel has misconstrued the Commission's finding, which clearly indicates that the decline in market share held by Japanese imports in 1993 was caused by reduced U.S. shipments of Japanese imports rather than reduced imports. *Final Det.* at I–16. The court finds that Nippon Steel's various objections as to the Commission's analysis of volume effects are either without merit or insufficient to undermine the Commission's conclusions as to volume effects.

### 3. *Price effects:*

Nippon Steel raises numerous objections to the manner in which the Commission analyzed price effects caused by the subject imports, stating that the evidence fails to establish significant underselling and price depressing and suppressing effects. Nippon also argues that the Commission ignored much of the evidence in the record. Defendant and defendant-intervenors respond that the Commission's finding was supported by the evidence, and that Nippon Steel simply seeks an alternative interpretation of the evidence.

The Commission collected pricing data concerning four groups of products that represented nearly all of the Japanese imports. Products 5 and 6 were not produced by the domestic industry, although domestic producers indicated that M–2 conventional grade did compete with Products 5 and 6, as the end uses for the products were the same. *See* Def.'s App., Conf. Doc. 25, at 77–78 (excerpt from Def.-Ints.' Prehearing Br. dated Apr. 6, 1994). The Commission, however, based its analysis of price data only upon Products 3 and 4.

The Commission observed that in 1992 and 1993 prices for M–3 grade Japanese imports (Product 3), reported by producers and importers, fell at a faster rate than domestic prices and resulted in underselling in the later stages of the POI. *Final Det.* at I–17; *see Conf. Staff Rpt.* at II–58

tbl. 20. The Commission found that this steady decline in M–3 prices was confirmed by purchaser prices reported in questionnaire responses. *Final Det.* at I–17; *see Conf. Staff Rpt.,* App. I, at I–5 tbl. I–3. With regard to pricing Product 4, the high-permeability grade product, the Commission found prices for Japanese imports had increased marginally during the period. *Final Det.* at I–17. The Commission focussed on the purchaser price data, finding evidence of consistent underselling, with an increasing margin during the period. *Id.; Conf. Staff Rpt.,* App. I, at I–6 tbl. I–4. The Commission concluded, on the basis of pervasive underselling of Product 4, the highest volume Japanese import shipped into the U.S. market,[8] that Japanese imports had a severe impact upon the domestic industry. *Final Det.* at I–17.

a. Evidence of underselling and price suppression:

Nippon Steel contends that the Commission erred in its finding that there was evidence of underselling for Product 3. Nippon asserts that the weight of the evidence does not support this view. Nippon points to several facts, including that: 1/ imported M–3 oversold domestic product in 10 of 16 quarters; 2/ purchasers reported overselling in all quarters; 3/ despite the downward trend in price, the volume of imports remained flat; and 4/ the decline in M–3 prices was caused chiefly by a price concession given by a Japanese producer other than Nippon, as assistance to a struggling U.S. purchaser. Defendant responds that despite evidence of overselling, M–3 prices exhibited a significant decline. Defendant further argues that even if evidence of overselling is present, this alone does not undermine the Commission's finding of relative price declines or evidence of underselling in the latter part of the investigation period. *See Kern-Liebers USA, Inc. v. United States,* Slip Op. 95–9, at 68–69 (Jan. 27, 1995) (sustaining finding of price depression/suppression based upon decline in average unit values for German imports, despite fact these values higher than domestic prices), *appeal docketed,* No. 95–1257 (Fed. Cir. Mar. 27, 1995). Thus, the court finds that the Commission's analysis of price effects for Product 3 was not seriously flawed.

In addition, Nippon Steel finds fault with the analysis of pricing data concerning Product 4. Nippon Steel contends that, in contrast to its methodology for Product 3, the Commission analyzed only purchaser price data, which reflected delivered prices that included freight costs. Nippon Steel alleges that the Commission was inconsistent in its use of methodology for the two products, and that the Commission should have analyzed the F.O.B. price data for Product 4 as it did for Product 3, because this data demonstrate overselling by Japanese imports in 11 of 16 quarters. *See Conf. Staff Rpt.* at II–59 tbl. 21. Nippon also notes that the Commission's choice of delivered prices for Product 4 is especially questionable given that the difference between delivered and F.O.B. prices for the domestic product is much greater than for imports.

---

[8] Product 4 represents nearly half of the quantity by volume of total high-permeability Japanese imports. *See Conf. Staff Rpt.* at II–59–II–61 tbls. 21–23.

Defendant responds that the Commission selected delivered price data for its analysis of Product 4 because it most clearly demonstrated the impact of imports on the domestic industry. Defendant insists that nonetheless, reliance upon producer/importer price comparisons would not have yielded a dramatically different result, as those comparisons show underselling in three of four quarters in 1993. Defendant asserts that the Commission's conclusion as to underselling and price suppression was reasonable, particularly in light of the fact that the domestic industry experienced losses in this product category in nearly all of the years of the POI.

The court finds that the Commission was not unreasonable in its reliance upon F.O.B. data for analysis of price effects regarding pricing Product 4. This producer/importer pricing data reflects underselling for every quarter of the POI. *Conf. Staff Rpt.*, App. I, at I–6 tbl. I–4. Despite domestic price increases for pricing Product 4 during the period, the Commission could reasonably find that there was underselling by the subject imports, as evidenced in both sets of pricing data, which suppressed domestic price increases. *See id.; Conf. Staff Rpt.* at II–59 tbl. 21. It is within the agency's discretion to select a particular methodology to assess significance of evidence of price undercutting, *Copperweld Corp.*, 12 CIT at 161, 682 F. Supp. at 565, and the choice must be supported by substantial evidence. *Mitsubishi Elec. Corp. v. United States*, 12 CIT 1025, 1050, 700 F. Supp. 538, 558 (1988), *aff'd*, 898 F.2d 1577 (Fed. Cir. 1990). Also, were the Commission instead to have focussed upon the pricing data reported by producers and importers, the data would have supported a finding of price effects as well, because the more recent data demonstrated a trend of underselling at a time when the condition of the domestic industry was in decline.

Nippon Steel also contends that the increase in Product 4 domestic prices runs counter to a finding of negative price effects. The evidence, however, supports the Commission's price suppression finding. During the course of the POI, industry costs rose more than 20 percent, which should have been reflected in prices, but domestic price increases for Product 4 in actuality were minimal. *Conf. Staff Rpt.* at II–32, II–59 tbl. 21; App. I, I–6 tbl. I–4. There is evidence of record that domestic producers responded to price reductions from imports, and thus were unable to realize price increases. *Final Det.* at I–17 n.109; *Conf. Staff Rpt.* at II–71–II–72.

Nippon Steel's final set of objections relates to Products 5 and 6. Nippon contends that the Commission's decision not to consider comparison of price data for these products in its analysis was erroneous, in view of the fact that the Commission acknowledged that these products competed with M–2 grade domestic product. *See Final Det.* at I–6. Defendant responds that because the domestic producers did not manufacture a product identical to Products 5 and 6, price comparisons would not be particularly probative, thus the Commission focussed on product data for more directly competitive products. According to defendant, because

M–2 is substantially less electrically efficient, it sells at a discount in comparison to the high permeability products. The court finds that the Commission's decision not to rely upon direct price comparisons between these products is supported by substantial evidence. The Commission's decision here is not inconsistent with its earlier finding that M–2 is substitutable for purposes of a like product analysis. *See R-M Indus.*, 848 F. Supp. at 210 n.9 (finding analysis of substitutability may vary for purposes of like product analysis, as compared with analysis of cumulation and material injury). Obviously, pricing comparisons require a high degree of product substitutability.

### b. Additional contentions:

Nippon Steel argues that the Commission failed to account for a great deal of record evidence in its causation analysis. Specifically, Nippon maintains that the Commission ignored evidence that: 1/ there is no domestic production of PDR GOES; 2/ one domestic high-permeability grade producer was very successful during the POI; 3/ domestic producers experienced quality and production problems during the period; 4/ excess domestic capacity was non-existent due to upstream melt capacity reallocated to stainless steel production; and 5/ substitutability for various grades of GOES was limited. Defendant responds that in many cases the Commission did address this evidence directly.

Specifically, the Commission did review evidence of various domestic production problems, *see Final Det.* at I–11 n.60; *Conf. Staff Rpt.* at II–30, II–33–II–34, and customer testimony concerning the relative substitutability between domestic and Japanese products. *See Final Det.* at I–7 & nn.23–24, I–8 n.29; *see also Conf. Staff Rpt.* at II–70. Further, the Commission indicated that domestic high-permeability GOES competes with most, but not all, of Japanese imported high permeability product. *Final Det.* at I–16. This statement certainly includes within it the fact that the domestic industry does not manufacture some high-permeability grades, such as PDR GOES. The Commission also recognized that certain domestic grades were suitable for transformers utilizing high-permeability grade GOES. *Id.* at I–8. As defendant notes, competition between high-permeability products such as PDR GOES and the domestic product existed despite the lack of identicality between these Japanese imports and the domestic products.

As to the evidence concerning profitability of one domestic producer, Nippon has presented only part of the relevant performance data. As defendant indicates, this producer also experienced consecutive losses in the manufacture of high-permeability products for the first three years of the POI. *See* Def.'s App., Conf. Doc. 17, App. E at E–3 (preliminary investigation staff report). Further, performance indicators also support a finding of nexus to the injury experienced by this producer, including increases in Japanese imports in absolute terms, as well as market share, during the same period in which the producer experienced its largest losses. *See Conf. Staff Rpt.* at II–48, II–51.

Defendant concedes that the Commission did not address expressly the issues of the domestic industry's capacity utilization and declining production levels as a function of diversion to the stainless steel industry. Defendant, however, emphasizes that this issue is only germane to one domestic producer, which indicated that its melt capacity did not restrain its GOES production. Def.'s App., Conf. Doc. 25, at 23, 25. As the evidence concerning capacity is conflicting, the Commission did not err in basing its determination on other substantial grounds. *See Grupo Indus. Camesa,* 853 F. Supp. at 445.

C. *Due process concerns:*

Nippon Steel also raises the argument that by the Commission's acceptance of late submissions of data from domestic producers, the Commission deprived Nippon of various procedural protections. Specifically, Nippon Steel objects to the rejection of its response submissions, and alleges it was not afforded a full opportunity to comment upon each of the producer submissions. Defendant answers that the producer submissions in question were received in a manner consistent with agency regulations, and that such receipt was not prejudicial to Nippon Steel.

The statute requires that in antidumping duty investigations,

> [i]nformation shall be submitted to * * * the Commission during the course of a proceeding on a timely basis and shall be subject to comment by other parties within such reasonable time as * * * the Commission shall provide.

19 U.S.C. § 1677f(e) (1988), *repealed by* 19 U.S.C.A. § 1677f(e) (West Supp. 1995)). The relevant regulation provides that,

> [a]ny party may file a posthearing brief concerning the information adduced at or after the hearing with the Secretary within a time specified * * *. In addition, the presiding official may permit persons to file answers to questions or requests made by the Commission at the hearing within a specified time. The Secretary shall not accept for filing posthearing briefs or answers which do not comply with this rule.

19 C.F.R. § 207.24 (1994).

Four submissions from domestic producers are at issue, dated April 4, April 7, April 28, and May 3, 1994. Each of the submissions was filed at the Commission's request. The first two submissions consisted of a tabulation, by grade, of the volume and value of the various grades of GOES, for each of the domestic producers. Def.-Ints.' App. to Mem. in Opp'n to Pls.' Mots. J. Agency R. at Tab 14. The second two submissions were, respectively, a document containing revisions to one producer's pricing data, and a document depicting that same producer's profit and cost data by product category (conventional or high- permeability GOES). *Id.* at Tabs 17, 18. The deadline set by the Commission for all questionnaire responses was March 9, 1994, and the deadline for posthearing briefs was April 20, 1994. Certain data from domestic producers

were verified on April 20 through April 22, 1994.[9] Nippon Steel sought to file with the Commission its comments as to all four of the domestic producer submissions, but each set of comments was rejected by the Commission as untimely. *See* Nippon Steel's App. to Mot. J. Agency R., Tabs 29, 32 (letters to Commission dated Apr. 11 and May 4, 1994); Tabs 33, 30 (response letters from Commission dated May 11 and 16, 1994).

Both the April 4 and April 7 submissions were supplied by domestic producers in response to requests made by the Commission consistent with the language of 19 C.F.R. § 207.24. *See* Def.'s Mem. in Opp'n to Pls.' Mots. J. Agency R. at 56. This data was not requested previously in the initial producer questionnaires, thus the domestic producers were not bound by the March 9 filing deadline. Further, the information was submitted prior to the deadline by which Nippon Steel was required to file its post-hearing brief, affording Nippon Steel opportunity for comment. The court notes that Nippon Steel did in fact discuss the data contained in the April 4 and April 7 submissions, both at the hearing and in post-hearing briefs. *See* Def.'s App., Conf. Docs. 35A; 39, at 155; 46, at Ex. 12.

In *General Motors Corp. v. United States,* 827 F. Supp. 774 (Ct. Int'l Trade 1993), this court considered petitioners' due process challenges regarding the lack of opportunity to object to respondents' new data submitted in answer to a Commission request. *Id.* at 782. The Commission had set a deadline for written submissions, but no provision was made for rebuttals. *Id.* The court in *General Motors* noted that "material injury investigations are not adversarial in a formal sense, and it is ultimately ITC's responsibility to evaluate the data it gathers." *Id.* Also, the court acknowledged that it is the Commission's choice to set and enforce time limits for submission of data. *Id.* Thus, in *General Motors,* the court determined that the Commission did not act unreasonably in its acceptance of a data submission one week after the deadline in response to a Commission request, or in its rejection of a rebuttal to that data filed three weeks after the deadline for all submissions. *Id.*

The court finds the facts presented here to be analogous to those presented in *General Motors.* Here, the Commission had set a deadline for receipt of all submissions, and subsequently pursued verification of certain data. The Commission did not establish any procedure for rebuttal concerning data submitted in response to Commission requests, or data revised post-verification. The risk that may arise from acceptance of late data without an opportunity for comment, that is, reliability of the data, is not present in this instance. The Commission verified the data it was to consider, including production data, for which there were no revisions recommended, and Nippon did have some opportunity to comment. The court finds Nippon's arguments regarding the first two submissions to be without merit.

---

[9] The data subject to verification related to profit-and-loss, production costs, assets, capital expenditures, research and development, pricing, production, shipments and employment. *See* Nippon Steel's App. to Mot. J. Agency R., Tab 6, at 2; Tab 25, at 2 (verification reports for domestic producer data). As a result of verification, the only data that changed was one domestic producer's production cost data, pricing data and selling, general and administrative expense data. *Id.,* Tab 6, at 2.

The court similarly does not adopt Nippon's view concerning the second two submissions dated April 28 and May 3, 1994. While each was filed after the deadline for data submissions, each was also provided in response to the Commission's requests. After verification of the specific domestic producer's data on April 20 and 21, 1994, the Commission staff indicated that the pricing data provided in one producer's questionnaire response had been overstated by between 2 and 5 percent and did not reflect customer discounts. *See* Nippon Steel's App. to Mot. for J. Agency R., Tab 6, at 2. Thus the Commission requested that this data be revised, for which the April 28 document was submitted. The profit and cost data contained in the May 3 document, segregating cost data for high permeability and conventional grade GOES, was sought with the intent of using it in the event the Commission found two like product groups. Def.'s Mem. in Opp'n to Pls.' Mots. for J. Agency R. at 59. Ultimately, the Commission did not rely upon this information.

The court does not find that the statute or the applicable regulation guarantees Nippon an opportunity for rebuttal to the April 28 and May 3 submissions. First, the data was not particularly helpful to the domestic industry. Second, the court does not view 19 C.F.R. § 207.24 to be unreasonable, as the agency must set up procedures that will always cut off some comments in order to manage the course of an investigation. It is also clearly within the agency's discretion to establish and enforce time limits upon the submission of data. *Avesta AB v. United States,* 12 CIT 493, 510–11, 689 F. Supp. 1173, 1188 (1988). As discussed earlier, the risk of lack of reliability of the data submitted late without an opportunity for full comment was minimized by the Commission's verification procedures. The Commission's acceptance of the April 28 and May 3 submissions falls within the scope of 19 C.F.R. § 207.24, and is consistent with the holding in *General Motors,* 827 F. Supp. at 782. The court concludes that no due process violations occurred as a result of either the Commission's acceptance of defendant-intervenors' submissions pursuant to the Commission's requests, or the rejection of plaintiffs' comments in response.

CONCLUSION

The Commission's determination regarding grain-oriented electrical steel imports from Italy and Japan is sustained, as it is supported by substantial evidence and is otherwise in accordance with law.