FLORAL TRADE COUNCIL, PLAINTIFF *v.* UNITED STATES, DEFENDANT, AND ASOCIACION COLOMBIANA DE EXPORTADORES DE FLORES, ET AL., DEFENDANT-INTERVENORS

Court No. 95–04–00382

· (Dated May 17, 1996)

*Stewart and Stewart (Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr.* and *Amy S. Dwyer)* for plaintiff.
*Lyn M. Schlitt,* General Counsel, *James A. Toupin,* Deputy General Counsel, Office of the General Counsel, United States International Trade Commission *(Anjali K. Hansen)* for defendant.
*Arnold & Porter (Michael T. Shor* and *William L. Busis), Wiley, Rein & Fielding (John A. Hodges, Alan H. Price, Willis S. Martyn III* and *Stephanie L. Goodman)* for defendant-intervenors.

## OPINION

RESTANI, *Judge:* This matter is before the court following a motion for judgment upon the agency record pursuant to USCIT Rule 56.2. The motion has been brought by plaintiff Floral Trade Council ("FTC") challenging the negative material injury determination of the United States International Trade Commission (the "Commission") in *Fresh Cut Roses From Colombia and Ecuador,* USITC Pub. 2862, Inv. Nos. 731–TA–684–685 (March 1995) (final negative determ.) [hereinafter *"Final Det."]. See Fresh Cut Roses From Colombia and Ecuador,* 60 Fed Reg. 14,448 (USITC 1995).

## BACKGROUND

On February 14, 1994, FTC and other interested parties filed a petition with the Commission and the International Trade Administration of the United States Department of Commerce ("Commerce"), alleging that an industry in the United States was materially injured or threatened with material injury by reason of less than fair value ("LTFV") imports of fresh cut roses from Colombia and Ecuador. The Commission determined that the domestic industry producing fresh cut roses was neither materially injured nor threatened with material injury by rea-

---

son of LTFV imports. *See Final Det.* at I–3 & n.2 (Vice Chairman Nuzum and Commissioner Rohr dissenting).

In the final determination, the Commissioners[1] found one like product consisting of all fresh cut roses and noted that there are at least one hundred species and thousands of varieties of roses. *Id.* at I–5–I–6. The Commissioners cumulated imports from Colombia and Ecuador for both their present material injury and threat of material injury determinations. *Id.* at I–15, I–26.

The Commissioners found that the fresh cut roses industry is subject to recurrent seasonal demand cycles that cause prices to fluctuate significantly. *Id.* at I–11. They cited Valentine's Day, Christmas, Easter, and Mother's Day as peak or significant demand periods for roses. *Id.* Because domestic production capacity is constrained, the Commissioners found that domestic rose growers "generally respond to these swings in demand with changes in prices rather than changes in shipments." *Id.*

## STANDARD OF REVIEW

The court will hold unlawful those determinations of the Commission found to be unsupported by substantial evidence on the record, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i) (1994).

## DISCUSSION

In determining whether a domestic industry is materially injured by reason of the imports under consideration, the Commission must consider:

> (I) the volume of imports of the merchandise which is the subject of the investigation,
> (II) the effect of imports of that merchandise on prices in the United States for like products, and
> (III) the impact of imports of such merchandise on domestic producers of like products, but only in the context of production operations within the United States.

*Id.* § 1677(7)(B)(i) (1988). Pursuant to 19 U.S.C. § 1677(7)(B)(ii), the Commission may also consider "such other economic factors as are relevant to the determination." *Id.* No single factor, however, is determinative, and the Commission considers all relevant factors "within the context of the business cycle and conditions of competition that are distinctive to the affected industry." *Id.* § 1677(7)(C)(iii).

## I. *Volume of Subject Imports:*

In analyzing the subject import volume, "the Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant." *Id.* § 1677(7)(C)(i).

---

[1] The "Commissioners" herein refers to the four Commissioners comprising the majority negative determination: Chairman Watson and Commissioners Newquist, Crawford, and Bragg.

Despite increases in absolute volume and market share by the subject imports, the Commissioners did not find the volume of subject imports to be significant. *See Final Det.* at I–18. Specifically, the Commissioners found that subject imports increased in volume from 380.4 million stems valued at $92.6 million in 1991 to 438.2 million stems valued at $94.4 million in 1992 to 534.8 million stems valued at $109.2 million in 1993. *Id.* at I–17. In interim (Jan.–Sept.) 1993, subject import volume was 413.2 million stems valued at $86.3 million, compared to 467.2 million stems valued at $101.6 million in interim 1994. *Id.* In terms of market share, the Commissioners found that cumulated subject imports increased by quantity throughout the period of investigation ("POI") from 46.1% of the U.S. market in 1991 to 56.0% in 1993 and from 57.0% in interim 1993 to 60.6% in interim 1994. *Id.* By value, the U.S. market share of cumulated subject imports increased from 39.8% in 1991 to 46.6% in 1993, and was 47.6% in interim 1993, compared to 52.1% in interim 1994. *Id.* at I–17–I–18.[2]

Plaintiff argues that the Commissioners' finding that the volume of subject imports was not significant, either absolutely or relative to domestic production or consumption, is not supported by substantial evidence. Plaintiff contends that statistical evidence established that the volume of subject imports was "massive and increasing." Moreover, plaintiff emphasizes that, with regard to the domestic industry, the Commissioners found that "[m]ost of the performance indicators of the U.S. industry declined from 1991 to 1993, including production capacity, production, U.S. producers' domestic shipments, number of employees, net sales, and net income." *Id.* at I–13. Additionally, the Commissioners found that domestic producers' U.S. shipments decreased in terms of both quantity and value from 368.2 million stems, valued at $118.4 million, in 1991 to 341.2 million stems, valued at $106 million, in 1993. *Id.* Plaintiff asserts that a "massive and increasing" volume of subject imports combined with a corresponding decline in domestic shipments (a 7.3% decline in volume and a 10.8% decline in value) "is the hallmark of a material injury finding." Pl.'s Mem. P. & A. in Supp. Mot. J. Agency R. at 8.

The Commissioners, however, found that while subject imports increased by 40.6% over the POI, and by 13.1% between interim periods, the rate of increase in their market share did not rise commensurately, increasing only 9.9% from 1991 to 1993, and by 3.6% between interim

---

[2] Prior to the vote in these final investigations, Commerce notified the Commission that it found zero or *de minimis* margins with respect to five Colombian producers and that these five companies were excluded from Commerce's affirmative LTFV determination. *Final Det.* at I–18 n.109. As a result, the Commissioners did not include roses from those firms as subject imports, but because the Commission sought data for all years of the POI and interim 1994, yet only obtained specific data regarding the rose production of these five producers for 1993, the export data from the five Colombian producers is generally included in the information of record, which the Commission considered the best information otherwise available. *Id.*

The Commissioners further noted that these five companies represented 23% of total imports from Colombia in 1993 and, therefore, "the absolute volume and market share of cumulated subject imports are significantly less if the (fairly traded) exports of these five Colombian companies are excluded." *Id.* Nevertheless, the Commissioners stated that, "[w]e do not find the absolute volume or increase in market share of subject imports to be significant regardless of whether we consider the volume accounted for by the five Colombian rose exporters that were excluded from Commerce's order." *Id.* at I–18 n.110.

periods. *Id.* at I–18. They attributed this occurrence to the 15.6% increase in overall apparent U.S. consumption by quantity between 1991 and 1993 and the 6.3% increase between interim periods. *Id.* The Commissioners concluded that "[t]his fact suggests that the subject imports were sold into important new markets and did not significantly displace domestic fresh cut roses in their existing markets." *Id.* Additionally, they found that "subject imports served largely to satisfy increases in demand in the mass merchandiser market." *Id.*

Plaintiff contends that the Commissioners' ultimate finding that the volume of subject imports was not significant was based on two subsidiary conclusions: (1) that the increase in subject import volume was substantially absorbed by the mass merchandiser segment of the market and did not impact domestic producer sales and (2) that domestic and imported roses had low substitutability and were, thus, insulated from direct competition.

### A. *The Mass Merchandiser Market Segment:*

At the outset, plaintiff contests many of the Commissioners' findings regarding the mass merchandiser market segment. In particular, plaintiff claims that direct and indirect sales could not account for the increase in subject import volume and the mass merchandiser market segment was not growing as fast as subject import penetration. Plaintiff further asserts that, based on respondents' estimates in their posthearing brief that imports accounted for roughly 95% of all roses sold in the mass merchandiser market segment, the Commissioners arrived at "wildly ranging estimates" that at least 25–30% (or as much as 61–71%) of subject imports were sold to mass merchandisers in 1993. Plaintiff also contends that based on 1993 data alone, the Commissioners could not have found that the mass merchandiser market segment, and imports directed into that segment, expanded over the POI. Finally, plaintiff argues the Commissioners should have considered the volume of imports, and the increase in that volume, in other market segments where imports and domestic roses compete head to head.

The court will address plaintiff's contentions in turn. First, plaintiff contends that the mass merchandiser market segment could not account for the increase in subject import volume as importers and domestic producers sold only a small fraction of their output directly to mass merchandisers (an average of 5.3% and 2.9%, respectively, of their total rose production in 1993). *See id.* at II–13–II–14. Plaintiff emphasizes that, on average, 84.9% of importers' 1993 sales to the United States are to unrelated wholesalers and 5.4% to unrelated retail florists. *See id.* at II–14. Furthermore, plaintiff argues that indirect sales from wholesalers to mass merchandisers could not account for the increase in subject imports.

Defendant, however, counters that the Commission received data on direct sales to mass merchandisers through questionnaire responses, but when the Commission became aware that wholesalers sold a far

greater percentage of the roses purchased by mass merchandisers, the Commission solicited data from the parties regarding the amount of such resales. The parties disagreed on the amount of roses wholesalers sold to mass merchandisers and the extent of the mass merchandiser market segment generally. *See id.* at I–19 n.115. Defendant claims that based upon a combination of the questionnaire data, the estimates submitted by the parties, and the data on consumption, the Commission found the size of the mass merchandiser market segment to range from 15.4 to 36.0% of total U.S. consumption in 1993. *See id.*

Plaintiff objects to the fact that the Commission questionnaire did not request information from purchasers regarding the percentage of their resales to retail florists as opposed to mass merchandisers. The court, however, notes that plaintiff was given an opportunity to comment on the questionnaire before it was finalized and failed to make an objection before the Commission. Tr. of Oral Argument at 110 (Ct. Int'l Trade Feb. 22, 1996). Absent such a timely objection, the court finds that the Commissioners reasonably relied on the evidence presented in determining the size of the mass merchandiser market relative to U.S. consumption. *See Holmes Prods. Corp. v. United States,* 16 CIT 1101, 1103 (1992) (argument may be waived by party if not raised at administrative level, resulting in prejudice).

Plaintiff's second claim of error is that the Commissioners failed to explain what evidence supported findings that "significant new markets for fresh cut roses" had emerged, that the mass merchandiser market segment was "the fastest growing market for fresh cut roses in the United States," that sales to this market drove the growth in U.S. apparent consumption during the POI, or that the mass merchandiser market segment was growing as rapidly as subject import penetration. *See id.* at I–12, I–13, I–19 n.114–15. Although plaintiff acknowledges that the Commissioners cited the Commission's economic memorandum and hearing testimony to support these conclusions, plaintiff claims that the economic memorandum did not state that the mass merchandiser market was newly developed during the POI and testimony of a former Commissioner that the mass merchandiser market was "new" in these investigations was not sufficient to support such findings. Additionally, plaintiff claims that the Commissioners relied primarily on purchaser questionnaire responses, which were anecdotal and biased, to support its findings of a growing mass merchandiser market segment.

Defendant counters that the Commissioners reasonably considered the increasing consumption by mass merchandisers and the fact that mass merchandisers were served primarily by subject imports. *See id.* at I–12, II–13 & n.51. Defendant contends that there was ample evidence in the record to support the Commissioners' finding that mass merchandisers were primarily responsible for the growth in U.S. rose consumption. *See id.* at I–12–I–13 & n.66 (citing *Final Det.* at II–19, Final Economic Memorandum at 12, Pet'rs' Posthear. Br. at 31). Defendant claims that importers repeatedly stated in response to the Commission

questionnaires that demand increased because of increasing sales to mass merchandisers (as well as availability of new varieties and colors) and that many domestic producers also cited the increase in sales to mass merchandisers. *See* Def.'s Opp'n to Pl.'s Mot. J. Agency R., Ex. 1 (importers' questionnaires); Pet'rs' Conf. Posthear. Br., List 2, Doc. 20, Ex. 13, at 28 (Feb. 3, 1995) (Roses Inc. Bulletin stating "[m]ost of the dramatic growth in floriculture sales including that of cut roses has come from growth in Mass Markets"). The court recognizes that "assessments of the credibility of witnesses are within the province of the trier of fact. This [c]ourt lacks authority to interfere with the Commission's discretion as trier of fact to interpret reasonably evidence collected in the investigation." *Negev Phosphates, Ltd. v. United States,* 12 CIT 1074, 1092, 699 F. Supp. 938, 953 (1988) (citations omitted). Accordingly, the court finds that the Commissioners reliance on its staff's economic memorandum, hearing testimony, and importer questionnaires to support their findings regarding the importance and growth of the mass merchandiser market relative to demand and consumption was reasonable.

Additionally, plaintiff claims that the Commissioners unjustifiably ignored the impact of subject imports on domestic producers within the mass merchandiser market segment. Plaintiff argues that the domestic producers' low penetration of the mass merchandiser market segment was a manifestation of import injury. The Commissioners, however, found that the domestic producers were not able to provide consistently the large quantities of roses that mass merchandisers require nor were they able to satisfy demand in all market segments during times of peak demand, especially during Valentine's Day, which accounts for the largest volume of rose sales for any given period. *See Final Det.* at I–18–I–19. The Commissioners also found that while importers of Colombian and Ecuadorean roses have "aggressively targeted and developed the mass merchandiser market over the period of investigation," domestic producers, with few exceptions, have not done so and instead "focused primarily on their traditional retail customer base." *Id.* at I–18. Finally, the Commissioners noted that the imported Visa rose helped stimulate mass merchandiser market demand because it is a lesser quality, yet durable, rose variety that domestic producers could not compete with and could not produce due to its low yield. *See id.* at I–19 n.114.

Plaintiff contends that both domestic producers and importers sold roses directly to mass merchandisers or to wholesalers who resold to mass merchandisers. As wholesalers that resold domestic and imported roses were the main suppliers to the mass merchandisers, plaintiff claims the Commissioners unreasonably concluded that only a few domestic growers sold to that market segment based on evidence of direct sales. Plaintiff also argues that domestic producers were able to consistently provide the large quantities of roses that mass merchandisers require and did so. Plaintiff further claims that the Commission collected actual sales data reported by individual domestic growers and

importers that established that domestic growers supplied a greater quantity of certain rose products to mass merchandisers than did importers. *See* Conf. Staff Rpt., List 2, Doc. 29, at I–78–I–80.

The court finds that substantial evidence supports the Commissioners' findings that importers targeted and captured most of the mass merchandiser market and that domestic producers were not able to adequately supply both the retail sector and the mass merchandiser market segment. The Commissioners relied upon hearing testimony, purchaser letters and questionnaire responses, purchaser statements in response to verification of lost sales allegations, and evidence that imported roses, which were impractical for domestic growers to produce, were physically better suited for the mass merchandiser market. As trier of fact, the Commission must assess the quality of the evidence and give such weight to the evidence that it believes is justified. *Iwatsu Elec. Co. v. United States,* 15 CIT 44, 47, 758 F. Supp. 1506, 1509 (1991). The court also finds that the Commissioners reasonably concluded that domestic producers' low penetration in the mass merchandiser market was not a sufficient indication of material injury.

Finally, plaintiff argues that the Commissioners disregarded the wholesale and retail florist market segments, where domestic roses and subject imports compete directly. Plaintiff claims that the largest volume of direct sales from importers and domestic growers competed in the wholesaler market segment, as wholesalers are free to resell either imported or domestic roses to mass merchandisers. Moreover, based on the Commissioners' estimates of the size of the mass merchandiser market segment, plaintiff asserts that the remaining import sales to retail florists was relatively large. Accordingly, plaintiff maintains that the Commissioners should have found the volume of subject imports significant in both of these market segments.

The Commissioners did not declare imports insignificant in the retail florist segment. The analysis proceeded on a different basis. At the outset, the Commissioners considered the fresh cut rose market as a whole. The Commissioners considered aggregate subject import volumes, aggregate domestic consumption, and aggregate subject import market share. *See Final Det.* at I–17–I–18. Next, the Commissioners considered the significant volume and market share data in light of increasing domestic consumption, inadequacy of domestic supply, the importance of non-price factors, and the limited substitutability between domestic and imported roses across all market segments. Accordingly, the court finds that the Commissioners properly considered all market segments.

## B. *Substitutability:*

According to plaintiff, the second major basis for the Commissioners' determination that the volume of subject imports was not significant was the lack of substitutability between domestic and imported roses. This was an important factor. The Commissioners found that the limited substitutability between domestic roses and subject imports along

with other non-price factors diminished the volume impact of subject imports. *Id.* at I–20. Much of the Commissioners' discussion regarding substitutability, however, centered on the effect of LTFV imports upon domestic prices. *See id.* Accordingly, the court will consider the issue in that context.

II. *Effect of Subject Imports on Domestic Prices:*

In analyzing the price effects of subject imports on domestic prices, the Commission must consider whether "(I) there has been significant price underselling by the imported merchandise as compared with the price of like products of the United States, and (II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree." 19 U.S.C. § 1677(7)(C)(ii).

The Commissioners found a number of factors relevant to their determination of the effect of subject imports on domestic prices, including the limited degree of substitutability between domestic and subject roses, the nature of demand for roses, and the availability of supply. *Final Det.* at I–21. The Commissioners stated that "price plays a subordinate role to other factors such as product quality, variety, and the seasonality of demand." *Id.* The Commissioners concluded that price comparisons in this industry had little probative value for several reasons: (1) there was mixed underselling and overselling by the subject imports with no consistent trend across channels of distribution or by type of sale; (2) there was little or no evidence of price depression as seasonal demand shifts drove price patterns; (3) there was no "significant" price suppression because domestic growers could not have raised prices to cover costs even in the absence of LTFV imports; and (4) other non-price factors and lack of correlation between the domestic and imported rose prices limited the effect of the subject imports on price. *See id.* at I–21–I–24. Plaintiff argues that each of the Commissioners' findings was based upon conjecture, mistake, or unverified allegations by parties opposed to the petition[3] and that factual information, collected by the Commission staff and supported by statistical analysis, established a direct and substantial nexus between subject import and domestic prices.

A. *Evidence of Mixed Underselling and Overselling:*

Plaintiff contends that subject imports consistently undersold domestic roses in the primary channel of distribution, the wholesale spot market, as well as in secondary channels. Specifically, plaintiff states that Colombian roses undersold U.S. roses in 56 of 60 instances for the low-end red rose comparisons, 107 of 166 instances for the high-end red rose comparisons, and in 62 of 101 instances for the non-red rose comparisons. *Final Det.* at II–56–II–57. Ecuadorean roses undersold U.S. roses

---

[3] Plaintiff's argument that the Commissioners based their findings on unverified and biased claims of interested parties was presented to the Commission and rejected. The court declines to reweigh this evidence. *See Iwatsu Elec. Co.,* 15 CIT at 47, 758 F. Supp. at 1509.

in 34 of 39 instances for the low-end red rose comparisons, in 111 of the 152 instances for the high-end red rose comparisons, and in 16 of 26 instances for the non-red rose comparisons. *Id.* at II–57.

With respect to pricing trends by channel of distribution, 89.1% of imported and 62.4% of domestic rose sales were made at the wholesale level of distribution. *Id.* at II–13–II–14. The Commissioners noted that underselling occurred in spot sales of both low-and high-end roses to wholesalers in 56 out of 60 comparisons and in 49 out of 60 comparisons in spot sales to retail florists. *See id.* at I–33 n.23. Plaintiff claims that subject imports undersold domestic roses in nearly every quarter over the POI and interim 1994 and this pattern was repeated for all three hybrid tea roses examined.

The court finds no error in the Commissioners' consideration of the pricing data. The Commissioners reasonably found the value of price comparisons limited by the large, daily price fluctuations of spot sales, the fact that certain comparisons were based on sales of significantly different quantities, which could have affected relative prices, and the limited substitutability between domestic and imported roses. *See id.* at I–22.

### B. *Price Depression:*

Plaintiff contends that subject imports depressed or suppressed prices to a significant degree notwithstanding increasing consumption. Plaintiff claims that "statistical analysis" established, and respondents admitted, that domestic and imported rose prices were positively correlated during the POI. Even without such a correlation in prices, plaintiff argues that the inability of domestic producers to raise prices to a profitable level—where an increasing number of U.S. growers reported losses, where domestic shipments were declining in a rising market, and where domestic growers were leaving the industry—established that domestic prices were depressed and suppressed.

In finding little or no evidence of price depression, the Commissioners cited fluctuations in price for both subject imports and domestic roses, with prices for red roses generally peaking in the first quarter of each year of the investigation, falling to lower levels during the remaining quarters, and reaching their nadir in the third quarter. *Id.* at I–22–I–23. The Commissioners also stated that prices for non-red roses similarly demonstrated seasonal fluctuations, although not as dramatically. *Id.* at I–23. Furthermore, the Commissioners found that taking seasonal fluctuations into account, prices of domestic roses were generally steady, decreasing only slightly during the POI, despite the fact that subject import prices of red roses fluctuated downward. *Id.* In sum, the court finds that the Commissioners' determination that there was no evidence of price depression as seasonal demand shifts dictated pricing patterns was supported by the record.

## C. *Price Suppression:*

As for price suppression, the Commissioners found that subject imports did not suppress domestic prices to a significant degree. *Id.* After considering petitioners' argument that domestic producers were unable to raise prices sufficiently to cover costs, three of the Commissioners found that domestic producers could not have done so even in the absence of LTFV imports from Colombia and Ecuador. *Id.* at I–23 & n.141 (Commissioner Newquist did not concur in this finding.). The three Commissioners based this finding on the fact that most purchasers questioned, stated that the current price of subject imports would have to be more than 10% higher to cause them to shift their purchases to domestic roses and the fact that non-subject imports would limit domestic price increases in the absence of LTFV imports from Colombia and Ecuador. *Id.* at I–23 & nn.141–43; *see* I–24 n.147; *see* I–25 n.153. Commerce determined that the final "all others" dumping margins were 6.41% for Colombia and 6.32% for Ecuador. *See Fresh Cut Roses from Colombia,* 60 Fed. Reg. 6980, 7018 (Dep't Comm. 1995) (final determ. of LTFV sales); *Fresh Cut Roses from Ecuador,* 60 Fed. Reg. 7019, 7043 (Dep't Comm. 1995) (same). Plaintiff argues that such reasoning is contrary to law as Congress has admonished the Commission not to weigh injury caused by imports against other causes, including "the volume and prices of imports sold at fair value" and "changes in patterns of consumption." S. Rep. No. 249, 96th Cong., 1st Sess. 74 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 460; *accord* H.R. Rep. No. 317, 96th Cong., 1st Sess. 47 (1979).

Defendant counters that considering what the condition of the domestic industry would have been absent LTFV imports is not an unlawful weighing of causes, rather it isolates the effects of LTFV sales on the industry. Although this is a fine distinction, it has been upheld in the past. *See General Motors Corp. v. United States,* 17 CIT 697, 706, 827 F. Supp. 774, 783–84 (1993).[4] The Commissioners' finding that purchasers would not switch purchases from subject imports to domestic products despite antidumping duties was coupled with a comparison of subject import volumes subsequent to Commerce's preliminary LTFV determination which did not reveal any significant drop-off in volume notwithstanding the fairly significant LTFV preliminary margins. *Final Det.* at I–23–I–24 & n.146. These findings supported the Commissioners conclusion that there was limited substitutability between domestic roses and subject imports.

---

[4] There appears to be, at least, a potential clash between this practice and the language of 19 U.S.C. § 1673 (1988) because the practice concentrates the inquiry on injury by reason of the dumping itself as opposed to injury "by reason of imports" which are dumped. The clash is only theoretical, however. In *Hyundai Pipe Co. v. United States,* 11 CIT 117, 120, 670 F. Supp. 357, 360 (1987), the court approved consideration of the margin of dumping as a discretionary factor in the material injury analysis and it has not wavered from this view. This approach is now codified in 19 U.S.C. § 1677(7)(C)(iii) (1994) (definition of material injury/impact on the affected domestic industry). While this statutory addition is not applicable to this earlier case, it certainly indicates that there is little reason to narrow *Hyundai* and to prevent the focus on the effects of the dumping itself, rather than simply the presence of the dumped imports in the market.

D. *Non-Price Factors and Substitutability:*[5]

The Commissioners found as a significant condition of competition in the industry, the fact that "fresh cut roses are not a homogeneous product, and there is a wide range of varieties of roses commercially available that satisfy different consumer preferences." *Id.* at I–11. While some varieties are offered exclusively by U.S. growers, the Commissioners found that others are offered exclusively by Colombian and/or Ecuadorean growers. *Id.* The Commissioners noted that "Colombian and Ecuadorean roses generally have longer, thicker stems, larger blooms, and more vibrant colors than domestic roses due to the ideal growing conditions in Colombia and Ecuador." *Id.* On the other hand, the Commissioners found that "[d]omestic roses are usually fresher than imported roses due to the proximity of production operations to purchasers." *Id.* at I–11–I–12.

The Commissioners also found that most purchasers questioned, reported that domestic roses were inferior in quality to subject imports. *Id.* at I–21 & n.125. Furthermore, the Commissioners determined that purchasers deemed product quality, which includes physical attributes such as stem length and thickness, bloom size, color, freshness, and durability (vase-life), more important than price. *Id.* at I–21 & n.126. The Commissioners stated that purchasers cited bloom size and availability of particular quantities and types of roses as the two most important factors they consider when making purchases and some purchasers, when contacted by the Commission, stated that these factors led them to buy imports in lieu of domestic roses. *Id.* Additionally, the Commissioners found that in many instances, despite the availability of lower-priced roses, sales of more expensive rose varieties increased, which further confirmed their finding that price plays a subordinate role to non-price factors such as product quality. *Id.* at I–21–I–22.

Plaintiff argues that the record contains ample evidence that, although domestic and imported roses may be distinguishable, they are substitutable. For example, plaintiff cites evidence indicating that, "while subject imports may have longer, thicker stems, larger blooms, more vibrant colors, domestic roses perform better because they are fresher." Pl.'s Mem. P. & A. in Supp. Mot. J. Agency R. at 31. The court does not find that this fact supports plaintiff's contentions, rather it supports the Commissioners' conclusion that there is low substitutability between the products. Plaintiff also points out an alleged inconsistency with Commissioner's Newquist's statement that, while domestic and imported roses are substitutable given the Commissioners' like product determination, "imported roses supply specific consumer preferences that domestic roses do not *(e.g.,* thicker stems, larger blooms)."

[5] Commissioner Newquist did not join in the plurality's discussion concerning "substitutability" between imported and domestic roses. *See Final Det.* at I–16 n.96. Once a like product determination is made, Commissioner Newquist declines to make other substitutability findings. *Id.* Commissioner Newquist, however, does consider characteristics and uses of the various domestic and imported products in his causation analysis.

*Id.* at I–16 n.96. The court, however, finds no inconsistency with Commissioner Newquist's statements as the plurality found limited substitutability, rather than none. Further, the court finds the Commissioners' conclusion regarding the importance of non-price factors and low substitutability between domestic and imported roses supported by the record. In sum, the court finds that the Commission's negative injury determination is supported by substantial evidence and is in accordance with law.